917 So.2d 583 (2005)
STATE of Louisiana
v.
Peter J. LEWIS.
No. 05-KA-170.
Court of Appeal of Louisiana, Fifth Circuit.
November 29, 2005.
*586 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Thomas J. Butler, Donald A. Rowan, Jr., Cameron M. Mary, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On May 6, 2002, defendant Peter J. Lewis, along with Clayton Weaver and Stanley Stirgus, were charged by indictment with second degree murder, in violation of LSA-R.S. 14:30.1. Defendant pled not guilty to this charge on the following day. On August 11, 2003, another indictment was filed, adding Sarah Harris as a co-defendant.[1]
On March 1, 2004, defendant and Weaver were re-arraigned, pled not guilty and, together, proceeded to trial. Defendant filed a motion to suppress a photographic lineup, which was denied on March 3, 2004. Thereafter, on March 9, 2004, the jury returned a verdict of guilty as charged as to both defendant and Weaver.
On March 11, 2004, defendant filed his first motion for new trial. A second motion for new trial was filed on April 21, 2004. On May 26, 2004, the trial court denied defendant's motions for new trial and sentenced him to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. An out-of-time appeal was granted on November 4, 2004.[2]

*587 FACTS

In the early morning hours of September 14, 2001, Ralph Sterling, also known as "Big Man," was killed at 324 Ruby Street, Apartment B. When the homicide occurred, Shirley Johnson, Brandon Harris, Sarah Harris, and three children were inside the residence.
On the scene, Detective Donald Clogher spoke to Shirley Johnson who advised him that three suspects entered the apartment, went upstairs and shot Ralph. Shirley identified Stanley Stirgus as one of the perpetrators. She said she knew him from the neighborhood and he had attempted to ask her out on several occasions prior to the incident. Deputy Allen Joanos spoke with Sarah and Brandon on the scene, and he was advised that the suspects were three armed black males with their faces covered. According to Deputy Joanos, the witnesses stated that they did not know the suspects.
Shirley, Brandon and Sarah were relocated to the Detective Bureau and were individually interviewed. Detective Clogher took a statement from Brandon who identified Stirgus in a photographic lineup. Brandon knew Stirgus because he had seen him around the neighborhood. Brandon did not give a description of the other two suspects.
Sergeant John Drury took Shirley from the scene to the Detective Bureau at approximately 4:30 a.m. and, at about noon on this day, she gave a statement. Shirley initially stated that the three perpetrators were wearing masks; however, she quickly reverted back to what she had told Detective Clogher at the scene, that is, they were not wearing masks. Although Shirley could only provide Stirgus' first name and where he lived, she described the other two perpetrators and explained that she had seen them prior to the incident. Shirley was shown a photographic lineup, and she identified Stirgus. She returned to the Detective Bureau on the following day and viewed two additional photographic lineups of the victim's associates who lived in the immediate area. In addition to identifying Weaver, she identified defendant as someone who participated in the murder at the apartment.
When Detective Meunier interviewed Sarah, she initially maintained that all three suspects were masked. However, she subsequently was shown photographic lineups and identified Stirgus, Weaver and defendant.
At trial, Shirley Johnson testified that she was a friend of the victim, who was dating Sarah. At the time, she was living in the apartment at 324 Ruby Street with her sister, who was working offshore at the time of the incident. Sarah's brother, Brandon, also lived with them. On the night of the murder, Shirley was at the apartment in a room with her two nieces, who were asleep, and her nephew, who heard knocking at the door. When Shirley went downstairs, she first saw defendant, who she knew lived across the street. She also observed Weaver, whom she knew from hanging around with defendant. Also, she knew the third person, Stirgus.
Shirley testified that Weaver and defendant were armed, and that defendant had some kind of machinegun. When she saw them, she turned around to run back upstairs while screaming for Sarah. At this time, Weaver grabbed her leg, defendant put a gun to her head, and she was told to go into a room. Stirgus went into the room with Shirley and the children. Defendant and Weaver were in her sister's room with Ralph and Sarah. Defendant was demanding money and car keys from Ralph. Shirley heard seven gunshots, and the three perpetrators then ran out. She testified that none of the perpetrators *588 were wearing masks, but she explained that she initially told the police they were wearing masks because Sarah had told her to. She testified that she was seared and thought they might come back for her.
Brandon testified that he knew the victim and was in the house when he was killed. That night, he was sleeping on the sofa downstairs when he awoke and saw Stirgus walk by. Although Stirgus attempted to cover his face, Brandon recognized him and saw some tattoos on his arm. He saw no one else. While dozing back off to sleep, he then heard screaming. Because he heard Sarah screaming seconds after he saw Stirgus walk by, he agreed that someone else must have gone upstairs before Stirgus. He recalled hearing the victim state, "I'm going to give it to you, Chief" before he ran down the street to his sister's house to call the police. Brandon admitted that the victim was a drug dealer.
After the police received information that Sarah was possibly involved, she was arrested and charged with the murder. At trial, Sarah, who was granted immunity by the State, testified that she knew the victim, but she then pled the Fifth Amendment and refused to answer questions. Thereafter, portions of her previous testimony from a motion to suppress hearing held on February 7, 2002 were read into the record.
In this testimony, Sarah stated that when her boyfriend, Ralph Sterling, was murdered, she was inside the apartment with Ralph, her brother, Shirley and a couple of children. Sarah stated that she had given a statement to the police and that later on that day, she viewed some photographs. Sarah was then cross-examined by Weaver's counsel. She admitted that she called the police and when the detectives arrived, she told them that the three suspects were wearing ski masks, because she was afraid. Thereafter, she told them that they were not wearing masks. She stated that Stirgus, whom she identified by photograph, was pointing a gun at her when she woke up. She said two people were in the room and they both had guns. The third person, whom she identified as Weaver, glanced in the room while holding a machinegun, but she did not see him at any other time during the incident. She wrote on the back of the photograph which she identified as Weaver that "[h]e took the kids in the room." She testified that Stirgus told Ralph to give them all the money, so she got the money and handed it to Stirgus, as directed by Ralph. After Ralph and Stirgus went into the bathroom, she heard gunshots. Thereafter, the suspects ran out of the apartment.
At trial, Stirgus, who was granted immunity by the State, also refused to testify and pled the Fifth Amendment. Thereafter, his five taped statements made to Detective Meunier on September 16, 2001 were played, and a transcription of each was given to the jury. Stirgus' first statement was exculpatory and provided information as to where he purportedly was at the time of the incident. He claimed he did not know the victim.
In his second statement, Stirgus admitted that he was in the apartment when the victim was shot, but that he remained downstairs. He stated that he thought they were just going to visit the victim. He admitted that he knew the other two men were armed with what looked like a machinegun and a nine millimeter, but he stated that he did not have a gun. He heard more than two gunshots and left.
In Stirgus' third statement, he noted that he had just been shown a lineup and identified "Dough Boy" as the person who was in the apartment armed with a machinegun. He then stated that he was *589 shown a second lineup in which he identified someone he called "Red" who was in the apartment armed with a nine millimeter. When speaking of Red, Stirgus stated, "he (inaudible) the shooter."
Stirgus admitted in his fourth statement that he went upstairs, but he was in another room with Shirley and the children. He stated that he ran after he heard the gunshots.
In Stirgus' fifth statement, he claimed that a few days before the incident, Dough Boy was talking about a "lick" (strong arm or robbery) of a man with five or six keys (kilos of dope) and twenty two thousand dollars. He stated that he needed help and he heard Big Man's name mentioned. Stirgus was later told that if he watched someone, he would get four quarters (dope). Stirgus knew that the other two men were armed that night. He was told to go in the room and watch Shirley and the children. He realized what was going on once they threw open the door, heard a couple of things and then heard gunshots. He claimed that he did not realize there was going to be a murder, but he knew there would be a strong arm for dope and/or money.
Susan Garcia, an expert in forensic pathology and qualified to give opinions with regard to cause and manner of death, performed an autopsy. She determined that the cause of death was a gunshot wound to the chest and the manner of death was homicide.

DISCUSSION
In his second assignment of error,[3] defendant asserts that the evidence was insufficient to uphold his conviction, because no reasonable juror could have believed the conflicting and self-serving testimony of the witnesses. The State responds that a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the appellant was guilty of second degree murder.
In reviewing the sufficiency of evidence, an appellate court must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6, 24, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Captville, 448 So.2d 676, 678 (La. 1984). This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including *590 aggravated burglary and armed robbery, even though he has no intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1(A). The State presented its case under the felony murder theory of second degree murder.
Under the felony murder doctrine, the State must prove the commission of the underlying felony or the attempt thereof. State v. Kirkland, 01-425 (La. App. 5 Cir. 9/25/01), 798 So.2d 263, 268, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415. In promoting this theory, the State argued the victim was killed during the commission of an aggravated burglary or an armed robbery.
Aggravated burglary is the unauthorized entry into an inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or theft therein if the offender is armed with a dangerous weapon upon entry, arms himself after entering, or commits a battery upon any person while inside or upon entering or leaving the place. LSA-R.S. 14:60.
Armed robbery is the taking of anything of value which belongs to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64(A).
The State attempted to prove defendant was at least a principal to second degree murder. "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." LSA-R.S. 14:24. Only those persons who "knowingly participate in the planning or execution of a crime" are principals to that crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428. Mere presence at the scene of a crime does not make one a principal to the crime. Id. However, "`[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention.'" State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225.
In State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 696-697, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, this Court upheld the defendant's second degree murder conviction after the jury determined he was at least a principal to the crime. This Court determined that 1) the defendant chose to remain with the co-defendant at the murder scene, with knowledge, by his own admission, that his co-defendant planned to rob the victim, 2) the defendant did nothing to prevent the crime, and 3) the defendant did not come to the victim's aid after the shooting, but rather fled the scene.
Also, in State v. Meyers, 95-750 (La. App. 5 Cir. 11/26/96), 683 So.2d 1378, 1383, writs denied, 97-0015 (La.5/9/97), 693 So.2d 766, 98-2530 (La.2/5/99), 737 So.2d 745, 00-0995 (La.12/8/00), 775 So.2d 1079, this Court upheld the second degree murder conviction of a passenger and driver who were in a car during a drive-by shooting. The defendants argued they did not have the requisite criminal intent. This Court noted that the defendant did nothing to assist the victim after the shooting, and did not call the police to report the shooting. This Court further noted that there was no direct evidence that the defendants knew the shooter was armed. However, this Court suggested that the jury reasonably inferred that all the occupants of the vehicle knew the purpose of *591 confronting the victim, a drug dealer, on the street that night.
In the instant case, just as in State v. Hill: 1) defendant was at the murder scene with a gun; 2) defendant did nothing to prevent the crime; 3) defendant fled the scene rather than rendering assistance after the victim was shot; and 4) defendant did not attempt to report the shooting. Just as in State v. Meyers, the jury in the present case could have reasonably inferred that defendant knew the purpose of confronting the victim, a drug dealer, in the early morning hours, between 3:00 and 4:00 a.m., armed with guns.
Defendant does not challenge his conviction on the basis that the elements of the offense were not proven. Instead, in his brief, defendant focuses on identification:
Three men entered that house. These men were armed and at least one of these men shot Ralph Sterling to death after robbing, or attempting to rob him. These facts were not in dispute. The facts that were in dispute were the most important ones, such as who in fact these perpetrators were.
Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Zeno, 99-69 (La. App. 5 Cir. 8/31/99), 742 So.2d 699, 706, writ denied, 00-0105 (La.6/30/00), 765 So.2d 1065. "Positive identification by only one witness is sufficient to support a conviction." State v. Williams, 02-645 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 503, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398. In the instant case, Shirley positively identified defendant as one of the perpetrators. Sarah identified defendant, Stirgus, and Weaver as the perpetrators as well.
Defendant further contends that fourteen-year old Shirley Johnson was the only fact witness the jury should have been able to consider. He argues that she gave several different statements to the police and at trial, and she is a self-proclaimed liar. Because reasonable jurors could not have possibly believed her testimony, he contends the evidence was insufficient to support his conviction.
The credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. In the instant case, the jury apparently chose to believe the testimony of Shirley, who was at the apartment when the victim was shot, despite some discrepancies in her statements. It was not unreasonable for the jury to excuse the discrepancies in statements made by Shirley, who was a juvenile and was afraid, and to disregard them as inconsequential. The record supports the finding that a reasonable juror could have inferred that defendant knowingly chose to participate in an aggravated burglary or armed robbery which resulted in the victim dying from a gunshot wound to his chest.
After carefully reviewing the record and viewing the evidence in the light most favorable to the prosecution, we find that the evidence was sufficient to support defendant's second degree murder conviction. Accordingly, this assignment of error is without merit.
In his first assignment of error, defendant contends that the trial court erred in denying his motion for new trial. He argues that the trial court's admission of the out-of-court statements of Stanley Stirgus and the prior motion hearing testimony of Sarah Harris constitutes prejudicial error. Defendant further contends that because he was only afforded his right of confrontation *592 as to one of the three witnesses who testified against him, the ends of justice would be served by granting him a new trial. In addition, defendant argues that the alternate juror improperly deliberated with the jurors. The State responds that any error in admitting the statements of Stirgus and the previous testimony of Sarah was harmless, because the statements and testimony were merely cumulative of other testimony. The State further contends that the trial court did not abuse its discretion in finding such evidence to be admissible. Finally, the State contends that the alleged juror misconduct did not fall within the exception of the jury shield law.
Defendant's initial argument regarding the trial court's admission of the out-of-court statements of Stanley Stirgus and the prior motion hearing testimony of Sarah Harris was based on LSA-C.Cr.P. art. 851(2), which provides that on motion of the defendant, the trial court shall grant a new trial whenever "[t]he court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error." According to LSA-C.Cr.P. art. 851, a new trial motion "is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded." A trial court's ruling on a new trial motion will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Benoit, 04-436 (La. App. 5 Cir. 9/28/04), 885 So.2d 625, 632.
The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. art. I, § 16; State v. Robinson, 01-0273 (La.5/17/02), 817 So.2d 1131, 1135. Confrontation means more than the ability to confront the witnesses physically. Its main and essential purpose is to secure for the opponent the opportunity of cross-examination. Id. Cross-examination is the primary means by which to test the believability and truthfulness of testimony and has traditionally been used to impeach or discredit witnesses. Id.; State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, writ denied, 05-0081 (La.4/22/05), 899 So.2d 559.
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court discussed the Confrontation Clause and held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. See also State v. Arita, 04-39 (La.App. 5 Cir. 3/1/05), 900 So.2d 37, 45. In Crawford, supra, the State sought to admit the recorded statement of the defendant's wife which was made during police interrogation as substantive evidence against defendant. The wife did not testify at trial because of the spousal privilege. In Crawford, the Supreme Court clarified that a statement given to police during a custodial interrogation is only admissible where the declarant is unavailable and there was a prior opportunity to confront the witness.[4]

*593 Stanley Stirgus

Defendant argues that the five audio-taped statements made by Stirgus to the police, which were played to the jury after Stirgus pled the Fifth Amendment, denied him of his right to confrontation, and he cites Crawford in support of his position.
Outside of the jury's presence, the State told the court that in Stirgus' second statement, some direct mentions of "Peter," were redacted and removed from the audio tape. Further, the State explained that the third statement included questions about identifications he made of "Red" and "Dough Boy." Although the State indicated that the individual Stirgus calls Red is Weaver and the individual he calls Dough Boy is defendant, neither defendant nor Weaver was identified as Dough Boy or Red in the statements. Defendant's counsel objected to the relevance of these statements. However, the court decided to let the statements into evidence, and defendant objected.
Applying the Crawford test, Stirgus' out-of-court testimonial statements were admissible only if he was unavailable to testify and defendant had a prior opportunity to confront him. According to LSA-C.E. art. 804, "a declarant is `unavailable as a witness' when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court." State v. Williams, supra at 1101. The record shows that because Stirgus invoked his Fifth Amendment right against self-incrimination and refused to testify at trial, he was unavailable. Thus, we now consider whether or not defendant had a prior opportunity to confront Stirgus.
Stirgus was not subject to cross-examination at the time his statements were made to the police. Although co-defendant Weaver had the opportunity to cross-examine Stirgus at a motion to suppress hearing on February 27, 2002, defendant did not have this opportunity. On March 3, 2004, defendant's motion to suppress a photographic lineup was heard and Stirgus was called as a witness, but he refused to testify, pleading the Fifth Amendment.
Considering the record before us and applying the principles of Crawford to this case, we find that defendant's Sixth Amendment right to confrontation was violated by the admission of Stirgus' statements. However, this Court has recognized that a violation of a defendant's right to confrontation is subject to a harmless error analysis. See State v. Arita, supra at 46. Accordingly, we must now consider whether or not the error was harmless in this case.
An error is harmless when the guilty verdict was surely unattributable to the error. State v. Antoine, 02-1068 (La. App. 5 Cir. 2/25/03), 841 So.2d 874, 881. Whether an error is harmless in a particular case depends upon many factors, including the following: 1) the importance of the witness' testimony; 2) whether the testimony was cumulative in nature; 3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; 4) the extent of cross-examination permitted; and 5) the overall strength of the State's case. State v. Maise, 00-1158 (La.1/15/02), 805 So.2d 1141, 1155.
Defendant contends that this violation was not harmless because 1) Stirgus' statements informed the jury that the robbery or burglary was planned in advance; 2) he was not given an opportunity for cross examination; and 3) there is a high probability that the verdict would have been different, because there were only two other witnesses and one was charged as a defendant.
*594 After carefully reviewing the record and conducting a harmless error analysis, we find that even without the prior out-of-court statements made by Stirgus to the police, the evidence presented by the State was sufficient to support defendant's conviction. In particular, Stirgus' statements implicate individuals he called Red and Dough Boy. No connection was presented to the jury to indicate defendant was the individual whom Stirgus called Dough Boy or that Weaver was the individual he referred to as Red. Further, Sturgis' statements were cumulative in nature and were corroborated by other testimony.
Shirley and Sarah identified defendant by photographic lineup. Shirley testified that defendant and Weaver were in the room with Ralph and Sarah, she heard defendant demanding money and keys from Ralph, and then she heard gunshots. From Shirley's testimony alone, the jury could have believed that defendant was involved in the execution of this crime.
Defendant contends that Stirgus' fifth statement informed the jury of the planning of the robbery or burglary in advance. However, the jury could have already reasonably inferred that it was planned in advance and that defendant knew the purpose of confronting the victim, a drug dealer, in the early morning hours armed with a gun.
Even though a confrontation error occurred in the admission of Stirgus' statements, considering the other testimony and evidence presented at trial, we find that the admission of these statements was harmless.

Sarah Harris
After Sarah refused to testify at trial, despite the fact that she was granted immunity, the trial court allowed her prior testimony from a February 7, 2002 motion hearing to be read into the record. Sarah testified as a fact witness at the motion hearing, but she had become a defendant by the time of trial. Defendant argues that because she was questioned as a witness and not as a defendant at the motion hearing, the defense was severely limited in its ability and opportunity to cross-examine her, and because this violated his right to confrontation, he is entitled to a new trial. Defendant also notes that these charges were "conveniently dismissed" after defendant was convicted and the State, as the party causing the witness to be unavailable, should not be allowed to profit.[5]
At the motion hearing on February 7, 2002, Weaver's counsel cross-examined Sarah, but defendant and his counsel were not present. Therefore, defendant did not have the opportunity to cross-examine Sarah at the time she testified. As a result, all references to defendant were redacted from the transcript of Sarah's previous testimony from the motion hearing which was read into the record. Defendant joined in Weaver's objection that Sarah's prior testimony should not be admissible because, at the time she testified and was cross-examined by Weaver's counsel, she was not a co-defendant. Particularly, defendant's counsel stated
Your Honor, as I mentioned in communication with you, I don't feel I have very much ground to object to this, because they've done their best to redact this to my client  the portions concerning my client would be removed.

*595 My concern is, you know, if I was to mention in a closing statement that this has nothing to do with it, I would expect no objection to come from the State. If they want to handle that on their close, that's fine. But I think th [sic] purpose of that was to remove all  like Mr. Rowan said, all reference to my client, and that would be direct or inferred in my opinion. So I don't think the  I'm not going to ask for instruction from the Court regarding that. But I feel that I do have the right to address that in my close.
The State responded that, under law, they had to redact all direct or indirect references to defendant, because he did not have the opportunity of confrontation at the time of the motion hearing. Defendant now argues that the admission of Sarah's testimony was still damaging, despite the redactions, because it bolstered the testimony of Shirley and Stirgus.
Applying the Crawford test, Sarah's testimony at the prior motion hearing was admissible only if she was unavailable to testify and defendant had a prior opportunity to confront her. Because she refused to testify, we find that she was unavailable. Although defendant did not have the opportunity to cross-examine Sarah and defendant's right to confrontation was violated, we find that the error was harmless, because the guilty verdict was surely unattributable to the error. It does not appear that Sarah's testimony was of great importance, especially since any references made to defendant were redacted. Further, the State presented a strong case based on the eyewitness testimony of Shirley.
Defendant argues that Sarah's previous testimony bolsters Shirley's testimony. Although some of Sarah's testimony was cumulative of other testimony presented at trial, contrary to defendant's argument and to his benefit, some of Sarah's testimony contradicts the testimony of other witnesses, including Shirley. We find no merit in defendant's argument, and thus, we conclude that the admission of Sarah's prior motion hearing testimony was harmless.

Ends of Justice
Defendant argues that, based on the ends of justice, he should be granted a new trial, because only three fact witnesses implicated him and his right to confrontation was violated as to two of those three witnesses.
With respect to the denial of the motions for new trial based on LSA-C.Cr.P. art. 851(5), i.e. that the ends of justice require the granting of a new trial, this Court has stated that a judgment denying a motion for new trial on these grounds is unreviewable by an appellate court, which may review the grant or denial only for error of law. State v. Terrick, 03-515 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1161, writ denied, 03-3272 (La.3/26/04), 871 So.2d 346. Accordingly, we find that the denial of the motion for new trial based on LSA-C.Cr.P. art. 851(5) presents nothing for this Court to review.

Improper Jury Deliberations
Defendant argues that the trial court should have afforded him a hearing or, in the alternative, a new trial, because the alternate juror improperly deliberated with the other jurors outside of the official deliberation room regarding the guilt of defendant. Defendant further contends that the alternate juror shared his training in psychology to explain how to read body language. The State responds that the trial court properly denied Lewis's request for a hearing at which the jurors in this matter would be called in an attempt to impeach their verdict, because the alleged pre-deliberation, inter-juror communications *596 between the principal and alternate jurors does not fall within the exceptions to the jury shield law.
LSA-C.E. art. 606(B) provides the following:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (Emphasis added.)
The prohibition provided in LSA-C.E. art. 606(B) is intended to preserve the confidentiality and finality of jury verdicts, and the confidentiality of the jurors' discussions. State v. Videau, 04-923 (La.App. 5 Cir. 3/1/05), 900 So.2d 855, 863. The prohibition against jury testimony is not absolute, however, and must yield to a substantial showing that the defendant was deprived of his constitutional rights. Id. An evidentiary hearing at which jurors shall testify is required when there are well-pleaded allegations of prejudicial juror misconduct violating the defendant's constitutional rights. State v. Videau, supra. A juror should not consider facts relating to the case unless such facts were introduced at trial under both constitutional and legal safeguards. State v. Johnson, 34,902 (La.App. 2 Cir. 9/26/01), 796 So.2d 201, 211, writ denied, 03-2631 (La.11/8/04), 885 So.2d 1124.
"Participation by alternates in deliberations is an extraneous influence on the jury representing a prima facie case of prejudice requiring reversal." State v. Barber, 97-2749 (La.4/24/98), 708 So.2d 1054. However, pre-deliberation communications, as alleged in the present case, do not fall within the exception provided by LSA-C.E. art. 606(B).
In State v. Horne, 28,327 (La.App. 2 Cir. 8/21/96), 679 So.2d 953, 956, writ denied, 96-2345 (La.2/21/97), 688 So.2d 521, after his conviction, the defendant alleged in a motion for new trial that several jurors, including an alternate juror, discussed the case among themselves and had formed an opinion as to the defendant's guilt. According to the alternate juror, one juror concluded that the defense psychiatrist was not credible because he had been paid for his testimony. Id. The defendant argued that "pre-deliberation discussion among the jurors, including the alternates, was equivalent to allowing the alternate juror to participate in deliberations resulting in an illegal procedure." Id. at 957. The Second Circuit provided,
.... communications among jurors, although violating the trial court's instructions, do not amount to "outside influences" or "extraneous" information. The defendant alleges no fact suggesting that the jury based its verdict on prohibited factors such as: coercion by a party, or inadmissible evidence of other crimes obtained from an out-of-court source.
Id. at 958. The court concluded that the trial court properly denied the defendant's motion for new trial and attendant request to examine the jurors because the intra-jury communications, if they took place, were not improper outside influences, extraneous *597 prejudicial information or objectively verifiable misconduct. Id. at 958.
The First Circuit has also held that inter-juror communications prior to deliberation violate the trial court's instructions, but do not amount to "outside influences" or "extraneous prejudicial information." State v. Emanuel-Dunn, 03-0550 (La.App. 1 Cir. 11/17/03), 868 So.2d 75, 82, writ denied, 04-0339 (La.6/25/04), 876 So.2d 829.
In the present case, it is not alleged that the alternate juror participated in jury deliberations in the deliberation room. Moreover, the record reflects that the court stated before the jury exited the courtroom for deliberations that "[t]he alternate must stay here." Defendant argues that the alternate juror participated in pre-deliberation discussions which could have amounted to deliberations of defendant's guilt before the conclusion of the evidence. However, even if such discussions took place, the alternate juror was not an outside source and such discussions were inter-jury communications only.
Defendant's argument relating to the alternate juror's psychological expertise to determine witness credibility, which was alleged to have been shared with other jurors, likewise lacks merit.
In Grotemeyer v. Hickman, 393 F.3d 871 (9th Cir.12/15/04), cert. denied, ___ U.S. ___, 126 S.Ct. 177, 163 L.Ed.2d 182 (2005), the defendant moved for a new trial submitting the declaration from an unhappy juror that the jury foreman had improperly used her medical expertise during deliberations. The motion for new trial was denied without an evidentiary hearing. The Ninth Circuit found that there was no jury misconduct in the federal constitutional sense, nor was there any showing of denial of an impartial jury. This court noted that:
The mere fact that the jury foreman brought her outside experience to bear on the case is not sufficient to make her alleged statements violate Grotemeyer's constitutional right to confrontation. Counsel ordinarily learn during voir dire what a veniremember does for a living, and use peremptory challenges to avoid jurors whose experience would give them excessive influence.
Id. at 878. The Court held that the past personal experiences of a juror may be an appropriate part of jury deliberations and expressed as follows:
It is probably impossible for a person who has highly relevant experience to evaluate the credibility of witnesses without that experience bearing on the evaluation. Were we to require the impossible and prohibit jurors from relying on relevant, past personal experience, about all we would accomplish would be to induce jurors to lie about it when questioned afterward, unless we limited jury participation to the most unworldly and ignorant individuals.
Id. at 880. The Court recognized that "[v]aried juror experience is a virtue that assists juries in ascertaining the truth."
Even assuming the alternate juror shared some expertise with the other jurors based on his background in psychology, jurors are expected to bring their personal experiences with them. When selecting a jury, counsel should consider the professions of potential jurors and how those professions may come into play throughout the stages of the trial. Even without a specialty in psychology, individuals may have their own means to judge the credibility of a witness by that witness' mannerisms. In fact, such means appear to have been encouraged by the trial court since the General Jury Charge *598 which appears in the record includes the following:[6]
In determining the credibility of witnesses, you may take into account his or her manner on the witness stand, the probability or improbability of his or her statement, the interest or want of interest he or she may have in the case, and every fact and circumstance surrounding the giving of his or her testimony which may aid you in weighing his or her statement.
We find that defendant's allegations of jury misconduct are without merit. Defendant's constitutional rights were not infringed upon, he did not suffer an injustice, and the trial court did not abuse its discretion. Thus, we find no reasonable possibility of prejudice to warrant a hearing.
For the foregoing reasons, we conclude that the trial court did not err in denying defendant's motion for new trial based on any of the grounds asserted by defendant, and this assignment of error is without merit.
In his third assignment of error, defendant argues that prosecutorial misconduct occurred at trial when the prosecutor approached defendant and pointed to him while asking Shirley Johnson if the individual was Peter Lewis. Defendant contends that because Shirley was the only live trial witness to implicate him, this tainted in-court identification was improper and prejudicial, resulting in an impingement of defendant's due process right to a fair trial. The State responds that there has been no showing of prosecutorial misconduct or improper trial procedures, and defendant was not prejudiced by the prosecutor merely clarifying which of the two defendants lived across the street from her.
At trial, Shirley identified defendant in a photographic lineup. She also verified that her signature appeared on the back of his photograph. She stated that she was sure that defendant and Weaver, whom she picked from the photographic lineup, were in the apartment on the night of the murder. She admitted that she did not know them by name, but she would know them if she saw them. She then stated that one of them, defendant, lived across the street from her. It is at this time that the prosecutor stated "Peter? Right here? This man right here?" Defendant objected to the prosecutor walking up to and pointing at defendant because it suggested an answer. The court overruled this objection and Shirley agreed that defendant was Peter, who lived across the street from her. Later, when Shirley was demonstrating how defendant put a gun to her head, she identified defendant and Weaver in court by pointing to them. During cross-examination, Shirley stated that defendant was in the apartment when the incident occurred. Defense counsel asked "Is this Peter Lewis?" Shirley responded affirmatively.
A suggestive identification procedure alone does not violate due process, for it is the likelihood of misidentification which violates due process. State v. Shepard, 03-268 (La.App. 5 Cir. 6/19/03), 850 So.2d 819, writ denied, 03-2168 (La.5/14/04), 872 So.2d 509. Even if an identification procedure is suggestive, the identification will be admissible if it is found to be reliable under the totality of the circumstances. State v. Wafer, 31,078 (La.App. 2 Cir. 9/23/98), 719 So.2d 156, *599 168, writ denied, 99-1114 (La.10/1/99), 747 So.2d 1137.
In State v. Joseph, 96-187 (La.App. 5 Cir. 11/14/96), 685 So.2d 237, 246, writ granted in part, 96-2998 (La.5/9/97), 693 So.2d 782,[7] this Court recognized that "[i]f the defense is allowed ample opportunity to cross-examine the witness, there is usually ample opportunity to remedy any suggestiveness in the identification."
Considering the circumstances in this case, we find that Shirley's identification of defendant was reliable and there was not a substantial likelihood of irreparable misidentification. Shirley had an opportunity to view the individual whom she identified as defendant on the night of the incident when he put a gun to her head. She testified that defendant was not wearing a mask or covering his face and, therefore, she was able to see him. At trial, Shirley looked at a photographic lineup, acknowledged that she had seen it before, and located defendant in the lineup. It is after she identified him in the photograph, with no evidence in the record of any hesitation or uncertainty, that the prosecutor asked if defendant, pointing to him, was the Peter Lewis who lived across the street from her. She agreed that she was absolutely sure defendant lived across the street and that he was in the apartment at the time of the incident.
Shirley initially identified defendant from a photographic lineup on the day after the incident. Further, defendant was not someone she saw for the first time during the crime. He was someone whom she knew, although not by name, prior to the incident because he lived across the street.
In the present case, after looking at the totality of the circumstances, we find that even if the in-court identification process was suggestive, Shirley's identification testimony was reliable and there was not a substantial likelihood of irreparable misidentification. Defendant had ample opportunity to cross-examine Shirley regarding her recollection of the incident and her identification of defendant as a perpetrator. Thus, we find that defendant's due process rights were not violated. Accordingly, this assignment of error is without merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). One error requiring corrective action was noted.
After sentencing, the trial court stated that defendant had "two years from the date these convictions become final to seek post-conviction relief." This Court has held that the trial court must advise defendant that the prescriptive period runs from the time his conviction and sentence become final. State v. Grant, 04-341 (La. App. 5 Cir. 10/26/04), 887 So.2d 596, 598 (Emphasis as found in the original). Accordingly, the trial court failed to properly inform defendant of the prescriptive period for filing post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8. Therefore, we remand the case and order the district court to properly inform defendant of the time from which prescription for post-conviction relief runs by sending written notice of such to defendant within ten days of the rendition of this opinion and to file written proof that defendant received the notice in the record. State v. Grant, supra.

DECREE
For the reasons set forth above, we affirm defendant's conviction and sentence. However, we remand the case and order *600 the trial court to properly inform defendant of the prescriptive period for filing post-conviction relief by sending written notice of such to defendant within ten days of the rendition of this opinion.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] On April 21, 2004, this charge against Sarah was dismissed.
[2] This appeal pertains solely to Peter Lewis.
[3] As explained in State v. Hearold, 603 So.2d 731, 734 (La.1992), on appeal, when issues are raised both as to the sufficiency of the evidence and as to one or more trial errors, the sufficiency of the evidence should be determined first.
[4] Crawford was decided on March 8, 2004. In the present case, the jury trial began on March 1, 2004, and the jury returned a verdict on March 9, 2004. This Court has applied Crawford to cases which were tried before the opinion was rendered. State v. Williams, supra at 1101, fn. 18.
[5] We note that the State filed motions to compel testimony from both Sarah Harris and Stanley Stirgus.
[6] Although the instructions were not made part of the transcript, the instructions given to the jury were filed in the record.
[7] This matter was remanded for resentencing on a different ground.