HANS J. LILJEBERG, Judge.
|2On March 4, 2010, a Jefferson Parish Grand Jury returned an indictment charging defendant, Andre C. Preston, with the attempted second degree murder of Cary Smoot in violation of La. R.S. 14:27:30.1 (count one), the second degree murder of P.D.[1] in violation of La. R.S. 14:30.1 (count two), possession with intent to distribute cocaine in violation of La. R.S. 40:967(A) (count five), and possession of a firearm while in possession of marijuana in violation of La. R.S. 14:95(E) (count six).[2] On March 12, 2010, defendant pleaded not guilty to all charges.
On February 13, 2012, defendant withdrew his pleas of not guilty to counts five and six only, and entered pleas of guilty. On count five, the trial court sentenced defendant to 15 years imprisonment at hard labor, the first two years to be served without the benefit of parole, probation, or suspension of sentence. And on count six, the trial court sentenced defendant to ten years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.
Defendant proceeded to trial on the remaining two counts, and on February 15, 2012, a 12-person jury returned verdicts of guilty as charged. The trial court denied defendant’s motion for new trial. Defendant waived sentencing delays, and the trial court sentenced defendant on count one to 50 years imprisonment at hard |3labor without the benefit of parole, probation, or suspension of sentence. And on count two, the trial court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. These sentences were ordered to be served consecutively to each other as well as the sentences already imposed on counts five and six. Defendant’s motion for appeal was granted. FACTS
On September 12, 2009, Cary Smoot was in his vehicle leaving Advance Auto Parts *1131 on Airline Highway in Kenner, when defendant exited a vehicle and discharged an AK-47 at least 17 times at Smoot.[3] Smoot sped off, but his vehicle, shot numerous times, did not travel very far.[4] He exited his vehicle and jumped into the vehicle of his friend, Walter Bailey, whom he had been following, and was driven to a police officer.
Johnny Campbell, a friend of defendant, testified that he remembered this shooting because he heard a gunshot, walked out of his house, and saw Cary Smoot get picked up in a car and speed off. Campbell walked to defendant’s house and told him that Cary Smoot had been targeted in a shooting. Defendant’s brother, Shaquille Preston, also testified that he was at home with defendant when Campbell arrived. After informing defendant of the shooting, Campbell and defendant then walked back to Campbell’s house, where they watched the police investigate the incident.
Officer Amanda Roh of the Kenner Police Department was on patrol when Cary Smoot flagged her down on Kenner Avenue. As the officer stopped her |4vehicle, Cary Smoot exited the passenger seat of his vehicle, and approached her in a state of panic, waving his arms in the air and claiming he had just been shot. He showed the officer a wound on his back, which was subsequently determined not to be a gunshot wound. Cary Smoot advised the officer that the incident occurred near 10th and Fairway Streets in Kenner. He gave the officer two names: “Roger” and “Kareem.”
At trial, Kirk McKenzie,[5] a neighborhood acquaintance of defendant and Roger Chairs, testified that defendant told him Chairs was driving while he (defendant) shot at Smoot with an AK-47 on September 12, 2009.
However, when defendant took the stand at trial, he denied shooting at Cary Smoot. He said he was at home with his brother that day when Campbell came to his house and told him that someone shot Smoot. Defendant explained that Chairs told him that he (Chairs) shot at Cary Smoot. Defendant maintained that he was friends with Cary Smoot and that he had no trouble with Cary Smoot’s cousin, Louis Smoot. He claimed that a few days after the shooting, he even met with Cary and told him that he wasn’t the person who shot at him.
Fourteen casings were recovered in connection with this shooting. Jene Rauch of the Jefferson Parish Sheriffs Office Crime Lab, an expert in the field of firearm and tool mark identification, determined that all 14 casings were of the same type and were consistent with having been fired from an assault-type weapon such as an AK-47.
Six days after this incident, on September 18, 2009, Detective Jeff Adams of the Kenner Police Department interviewed Cary Smoot, who identified three individuals as the perpetrators: defendant as the shooter, Chairs as the driver, and |,.¡Kareem Nicholas as a passenger. Arrest warrants were subsequently issued for all three men.
*1132 A couple of months later, on the evening of November 6, 2009, Cary Smoot encountered defendant at a football game at Buddy Lawson playground in Kenner. As defendant stood near the concession stand, he flashed Cary a black 9 mm Gloek handgun positioned in his waistband.
The next night, Cary saw his cousin Louis out with Calvin Bardell near Jesse Owens playground in River Ridge. Then, later that night, in the early morning hours of November 8, 2009, Cary was visiting his girlfriend on Bengal Road in River Ridge, when he heard at least 30 gunshots. Concerned for his cousin, he immediately called Louis, who told him that defendant and Chairs were shooting at him. Cary then called defendant to confront him.[6] Defendant told Cary that he wasn’t trying to shoot Louis, that he was just trying to scare him, and that if he wanted Louis dead, he would have killed him.
At trial, Ernest Pollard and Calvin Bar-dell testified about the events in the late evening hours of November 7 and the early morning hours of November 8.[7] On the night of November 7, 2009, Pollard was outside a bar when Chairs drove up in a black SUV with Joshua Moss and Samuel Baker. Pollard, an admitted drug addict, approached the vehicle and asked Chairs for some “dope.” While talking to him, Pollard noticed Chairs had a MAC-11 weapon in his lap. Pollard joined the men and rode around with them for a little while before being dropped off.
Then, later that night, Pollard was picked up by Bardell, Louis Smoot, and a fourth individual, Brandon Watson. The four men, looking to purchase marijuana, proceeded to Jesse Owens playground. Bardell was driving, Watson was sitting | behind him, Louis was in the front passenger seat, and Pollard sat behind him. While on South Upland Avenue near the playground, another vehicle driven by defendant pulled up behind Bardell’s vehicle. Chairs, Moss, and Baker were in the vehicle with defendant; Chairs was seated in the backseat. Defendant and Chairs began asking Bardell who was in the front seat next to him. Bardell did not answer, but noticed that a backseat occupant of the other vehicle was wielding a MAC-11. Louis Smoot, who appeared afraid, attempted to duck out of view and repeatedly told Bardell to drive off. As the tension between the two vehicles escalated, Pollard noticed defendant reaching for something. At this moment, Bardell fled south on Upland Avenue towards Jefferson Highway, prompting an eruption of gunfire from defendant’s vehicle. When Bardell reached Jefferson Highway, he turned left; defendant’s vehicle turned right. After fleeing the scene, Pollard spoke with Baker on the phone and heard Chairs in the background saying he wanted “to light up everything in the car.”
In his post-arrest statement[8] and in his testimony at trial, defendant offered the following version of events regarding that night. On November 8, 2009, defendant just recently purchased a Glock handgun that he wanted to test. So in a vehicle driven by Baker, defendant, in the passenger seat, proceeded to South Upland Avenue near Jesse Owens playground for that purpose. Also in the vehicle were Chairs *1133 and Moss. When the four men arrived at the playground, they encountered another vehicle with four occupants: Louis Smoot, Bardell, Watson, and a fourth individual whom defendant knew as “D-Lo.” Chairs suspected the front passenger in the other vehicle was Louis, so he started asking who was in the front passenger seat. Defendant then heard Louis telling Bardell to drive off. After about the fourth time Louis told Bardell to leave, Bardell drove off, which |7prompted Moss to roll down the back window and shoot the Glock into the ground, which jammed after one discharge. Chairs then discharged his MAC-11 into the air in the direction of the fleeing vehicle.
That same night, in the nearby Mark Twain apartment complex, Timothy Williamson was awakened by a girl’s voice in his living room. He entered the room and turned on the light to find his seven-year-old step-daughter, P.D., lying on an air mattress stained with blood. Her cousin, who had been sleeping next to P.D. on the mattress, said, “I don’t know what’s wrong. She just yelled out.” Williamson called P.D.’s mother into the room. She took P.D. into the bathroom where she noticed “something in her neck.” At this point, Williamson called 911, but P.D. died thereafter. The autopsy revealed the cause of death to be a gunshot wound to the neck.
Surveillance equipment of the KOA Campground on Jefferson Highway, approximately one block from the Mark Twain apartment complex, captured an audio recording of gunfire that night. In the recording, one gunshot is audible, followed several seconds later by a rapid sequence of more gunfire. The time/date stamp on the surveillance footage indicates the gunfire occurred at 4:12 a.m. on November 8, 2009.
On the following night, November 8, 2009, Kirk McKenzie encountered defendant and Chairs. Chairs told McKenzie that he shot at Louis Smoot the night before with his MAC-11, that a little girl was killed, and that he thought he did it. Defendant told McKenzie that he fired shots too, but he was just testing out his Glock; he wasn’t shooting at the other vehicle.
On November 9, 2009, Deputy Derrick McGee of the Jefferson Parish Sheriff’s Office was investigating the death of P.D. and asked Cary Smoot if he knew anything about it. As Cary Smoot had cooperated as an informant in the |spast, he informed Deputy McGee that defendant and Chairs were shooting at his cousin, Louis Smoot, near the Jesse Owens playground in the early morning hours of November 8, 2009.
The next day, defendant was arrested on the outstanding warrant for the attempted second degree murder of Cary Smoot. He was arrested in a motel room on Veterans Boulevard in Kenner, where a search warrant was executed and two loaded semiautomatic pistols were recovered: a Glock 9 mm and a .45 caliber. Also recovered were 26.9 grams of marijuana, 7.6 grams of crack cocaine, a scale, and two Glock magazines.
At the time of his arrest, defendant was advised of his Miranda rights before being transported to the Jefferson Parish Sheriffs Office detective bureau. Then, at the bureau, Detective Brett Beavers again advised defendant of his rights with an advice of rights form. Defendant initialed and signed the form, indicating he understood his rights. Defendant waived his rights and gave a statement.
Subsequently, defendant was booked into the Jefferson Parish Correctional Center, where he encountered Richard Brush, who was also in custody.[9] Defen *1134 dant told Brush he was in jail because he “tried to kill that b**** Cary [Smoot],” shooting up his vehicle with an AK-47. Defendant further explained to Brush that he and Chairs encountered Louis Smoot near Jesse Owens playground and gunfire ensued as both Chairs and defendant fired their weapons during a car chase.
On November 16, 2009, Detective Beavers interviewed Louis Smoot. Louis completed an affidavit in which he described the events that occurred in the early hours of November 8, 2009. His description corroborated Bardell’s and Pollard’s testimony. In the affidavit, Louis attested that he was riding in a vehicle with [flBardelI, Pollard, and Watson. Bardell was driving and Louis was seated in the front passenger seat. The four men, looking to purchase marijuana, stopped on South Upland Avenue, where they were approached by another vehicle occupied by defendant, Chairs, and others. Fearing for his safety, Louis told Bardell to drive off. As he did, the occupants of the other vehicle opened fire.
Thirteen casings were recovered from South Upland Avenue. Twelve of the casings were similar, while one was not. It was determined that the 12 similar casings were consistent with having been fired from a MAC-11, while the dissimilar casing was discharged from the dock handgun recovered from defendant’s motel room.
These casings were spread out over 247 feet of South Upland Avenue. Colonel Timothy Scanlan, the director of the Jefferson Parish Sheriffs Office Crime Lab and an expert in the fields of firearm and tool mark identification, crime scene reconstruction, and bloodstain pattern analysis, testified this broad dispersal of casings is consistent with the shooter being mobile, e.g., in a moving vehicle. Colonel Scanlan also determined that based on the locations of the casings on the scene, the dock casing was consistent with the dock having been fired from the driver’s side of the vehicle, while the other casings were consistent with the weapon having been fired from the passenger side of the vehicle. Colonel Scanlan further opined that the location of the dock casing was consistent with the weapon being fired from the driver’s seat of the vehicle, not the driver’s side rear passenger seat. Lastly, Colonel Scanlan found that there was no evidence to indicate that the round from the dock was fired into the ground, as defendant claimed.
In addition to the 13 casings, eight projectiles were recovered on the scene. Seven of these eight were determined to be consistent with having been fired from 110the MAC-11, while the eighth was too damaged for any conclusions to be drawn. No projectile from the dock was recovered.
The projectile responsible for P.D.’s death was recovered during the autopsy. Both the firearm expert and Colonel Scan-lan determined that this projectile was fired from the same weapon as the other projectiles, and it was consistent with having been fired from the MAC-11; it was not fired from the dock. Colonel Scanlan also explained that this fatal bullet passed through the wall of P.D.’s apartment, passed over her cousin sleeping next to her, and struck P.D. in the neck. Colonel Scanlan determined that the trajectory of this bullet is consistent with the weapon of origin being discharged on South Upland Avenue.
Bonnie DuBourg, employed by the Jefferson Parish Sheriffs Office and an expert in DNA analysis, analyzed a dock pistol and magazine, a Springfield Armory *1135 .45 caliber pistol, and a White Sox baseball cap recovered from South Upland Avenue. With respect to the DNA on the Glock pistol, defendant could not be excluded as a possible donor; Chairs and Baker were excluded as possible donors, and no conclusion could be made regarding Moss. With respect to the DNA on the Glock magazine, defendant could not be excluded as a possible donor; Chairs and Baker were excluded as possible donors, and no conclusion could be made with respect to Moss. Regarding the DNA on the Springfield Armory .45 pistol, no conclusion could be made as to defendant, while Chairs, Baker, and Moss were all excluded as possible donors. And the DNA present on the baseball cap was determined to be consistent with that of Chairs, while Moss could not be excluded; defendant was excluded, and no conclusion could be made regarding Baker.

DISCUSSION

In defendant’s sole assignment of error, he argues the evidence was_[_y insufficient to support his convictions for the attempted second degree murder of Cary Smoot and the second degree murder of P.D. The State contends otherwise.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Michel, 09-953, p. 4 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, 534, writ denied, 10-1357 (La.1/7/11), 52 So.3d 885.
Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20, p. 6 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id., 08-20 at 7, 985 So.2d at 240.
The requirement that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to “the actual trier of fact’s rational credibility calls, evidence weighing and inference drawing.” State v. Caffrey, 08-717, p. 4 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10), 27 So.3d 297, citing State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56. “The reviewing court is not permitted ‘to decide whether it believes the witness or whether the conviction is contrary to the weight | iaof the evidence.’ ” Id. It is not the appellate court’s function to re-evaluate the credibility of witnesses or reweigh the evidence. Id.

Count One: Attempted Second Degree Murder of Cary Smoot

In count one, defendant was charged with and convicted of the attempted second degree murder of Cary Smoot in violation of La. R.S. 14:27:30.1. To prove attempted second degree murder, the State must establish beyond a reasonable doubt that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. State v. Robertson, 11-1017, p. 8 (La.App. 5 Cir. 5/31/12), 98 So.3d 401, 406 writ denied, 12-1432 (La.1/11/13), 106 So.3d 547. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. *1136 Id., 11-1017 at 6, 98 So.3d at 405. Specific criminal intent, as a state of mind, need not be proven as fact but may be inferred from the circumstances and the actions of the accused. Id., 11-1017 at 6-7, 98 So.3d at 405. For instance, the specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing in the direction of the victim. Id., 11-1017 at 7, 98 So.3d at 405. In Robertson, this Court found the evidence was sufficient to support a conviction for attempted second degree murder where the defendant discharged a .45 caliber handgun seven times at a vehicle containing two occupants. Id., 11-1017 at 8, 98 So.3d at 406.
In the instant case, there was conflicting testimony regarding who opened fire upon Cary Smoot in his vehicle on September 12, 2009. On the one hand, defendant, Johnny Campbell, and defendant’s brother each maintained that defendant was at home at the time. On the other hand, Cary identified defendant as the shooter; Kirk McKenzie testified that defendant told him he shot at Cary with | isan AK-47; and the 14 casings recovered from the scene were consistent with having been fired from an AK-47.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. Jones, 08-20 at 7, 985 So.2d at 240. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Dixon, 07-915, p. 11 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ denied, 08-0987 (La.1/30/09), 999 So.2d 745.
The jury heard testimony from all the witnesses, reviewed all the evidence, and concluded that defendant discharged an AK-47 14 times at Cary Smoot on September 12, 2009. We will not disturb the jury’s credibility determination on appeal, and further find that the evidence, viewed in the light most favorable to the prosecution, is sufficient to support defendant’s conviction of attempted second degree murder.

Count Two: Second Degree Murder of P.D.

In count two, defendant was charged with and convicted of the second degree murder of P.D. in violation of La. R.S. 14:30.1. Second degree murder is defined as the killing of a human being when the offender (1) has specific intent to kill or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies even though he has no intent to kill or to inflict great bodily harm. State v. Lewis, 05-170, p. 8 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277 (citing La. R.S. 14:30.1).
A review of the record indicates that the State sought to convict defendant under either theory of second degree murder as the jury instructions present both 1 ^definitions of the offense. Under this theory, the State alleged that defendant committed the underlying felony of assault by drive-by shooting. Assault by drive-by shooting is an enumerated felony under La. R.S. 14:30.1(A)(2) and is defined as “the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person.” La. R.S. 14:37.1(C).
In the instant case, there was conflicting testimony regarding defendant’s actions at 4:12 a.m. on November 8, 2009 on South Upland Avenue. At trial and in his post-arrest statement, defendant maintained he was not driving the vehicle that night. Yet, both Pollard and Bardell testified that defendant was in the driver’s seat.
*1137 Defendant also denied discharging his Glock that night. However, witness testimony and physical evidence indicate the contrary. In the moments immediately preceding the gunfire, Pollard noticed defendant reaching for something. Minutes after the gunfire, defendant told Cary that he was not trying to shoot Louis, that he was just trying to scare him. The next day, defendant told McKenzie he had discharged his weapon, though not at the other vehicle. And days later, after defendant had been taken into custody, he told Brush that he and Chairs had discharged their weapons during a car chase.
In addition, the ballistics evidence indicates one round was fired from defendant’s Glock before the weapon jammed. The firearm expert explained this jam could have been caused by “limp-wristing,” i.e., when the weapon is held with just one hand. This occurs because Glock firearms require more force to depress the trigger, so the weapon can jam if is not gripped firmly enough. Therefore, if defendant was driving the vehicle, as Pollard and Bardell claim, it is likely that he would have fired the Glock with one hand, his left hand, out the driver’s window. 11fiDefendant explained that he is right-handed. Consequently, defendant’s discharging his Glock with one hand, his non-dominant hand, could explain the jammed weapon and is further corroborated by the location of the Glock casing on the street, which Colonel Scanlan testified is consistent with the Glock being fired from the driver’s seat of the vehicle.
Furthermore, defendant could not be excluded as a donor of the DNA found on the Glock pistol and magazine; there was no evidence found to indicate that the round from the Glock was fired into the ground; and no projectile from the Glock was recovered.
Despite the conflicts in testimony, if there is no internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness is sufficient to support a conviction. Dixon, supra. Here, the jury heard testimony that defendant was driving the vehicle and that he discharged his Glock in the direction of the other vehicle. This testimony was corroborated by the physical evidence. Therefore, deferring to the trier of fact’s rational credibility calls, evidence weighing, and inference drawing, Caffrey, supra, we find that any rational trier of fact could have found defendant was driving that night and that he discharged his Glock in the direction of the other vehicle.
Defendant further argues that even if he was the driver, which he maintains he was not, his conviction should still be vacated because the evidence did not indicate that he had the specific intent to kill or inflict great bodily harm upon P.D. However, under the felony murder doctrine, one need not possess a specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. State v. Petty, 12-278, p. 10 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623. Rather, the State need only prove the commission of the underlying felony or the attempt thereof. Id.
 |1fiIn addition, under the law of principals, a person may still be convicted of a crime even if he has not personally fired the fatal shot. State v. Massey, 11-357, p. 14 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 463, writ denied, 12-0991 (La.9/21/12), 98 So.3d 332. Principals are “all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.” Id., 11-357 at 13, 91 So.3d at 463 (quoting La. R.S. 14:24).
*1138 For instance, in State v. Brooks, 42,226 (La.App. 2 Cir. 8/15/07), 962 So.2d 1220, the defendant was convicted as a principal on two counts of second degree murder when the defendant drove the vehicle from which occupants fired handguns into a crowd, killing two people. The defendant and other members of his gang planned to retaliate against a rival gang member who fired shots at them earlier that day. Brooks, 42,226 at 2, 962 So.2d at 1221. The plan was carried out when the defendant drove by the house where the rival gang often congregated. Id., 42,226 at 2, 962 So.2d at 1222. As the defendant drove by, his three armed accomplices opened fire at several individuals, including the target, who were standing in the front yard. Id., 42,226 at 2-3, 962 So.2d at 1222. The target was not killed, but two other individuals were. Id., 42,226 at 3, 962 So.2d at 1222. The second circuit found this evidence “was sufficient for a reasonable trier of fact to conclude that the defendant was guilty of second degree murder as a principal in a drive-by shooting that resulted in the death of the two victims.” Brooks, 42,226 at 9, 962 So.2d at 1225.
In the present case, the evidence indicates that defendant, planning to test his new Glock handgun, brought this semiautomatic firearm, loaded with multiple rounds, into a residential neighborhood with the intention of discharging it, an act li7he knew to be illegal. Nonetheless, he proceeded with Chairs, who defendant knew also was armed. When they arrived, they encountered another vehicle, which they suspected contained their rival, Louis Smoot. After a tense few moments, in which defendant was seen reaching for something, the other vehicle drove off, prompting defendant and Chairs to open fire in the direction of the departing vehicle to scare its occupants. Defendant fired first, but his weapon jammed after the first round. So, Chairs unloaded 12 rounds from his MAC-11, one of which struck and killed P.D.
Since the evidence indicates defendant discharged his weapon for the purpose of scaring the occupants of the other vehicle, we find that a rational trier of fact could find that defendant possessed the requisite intent to commit a drive-by shooting. See La. R.S. 14:37.1(C) (“ ■ ■ • with the intent to ... frighten another person.”). And, as in Brooks, supra, because defendant drove the vehicle, thereby enabling Chairs to discharge his weapon, we find that a rational trier of fact could find that defendant aided and abetted in the commission of the drive-by shooting that resulted in the death of P.D.
Consequently, viewing this evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact would have found defendant guilty beyond a reasonable doubt of at least second degree felony murder as a principal in a drive-by shooting that resulted in the death of a seven-year-old girl.
This assignment of error lacks merit. DECREE
Accordingly, defendant’s convictions and sentences are affirmed.

AFFIRMED

. To observe the principle of protecting minor victims and victims of sexual offenses set forth in La. R.S. 46:1844(W)(3), the victim and anyone whose name can lead to the victim’s identity, i.e., parent, sibling, or relative with the same last name as the victim, will be identified by initials only. The bill of information indicates P.D.’s date of birth is April 29, 2002. Thus, at the time of her death, she was seven years old.

. Also charged in this indictment were co-defendants Roger Chairs, Samuel Baker, and Joshua Moss. Roger Chairs was charged with attempted second degree murder (count one), second degree murder (count two), possession of a firearm having been previously convicted of a felony in violation of La. R.S. 14:95.1 (count three), and obstruction of justice in violation of La. R.S. 14:130.1 (count four). Samuel Baker and Joshua Moss were charged with obstruction of justice (count seven). It is noted that on September 23, 2011, Roger Chairs was found guilty as charged on counts two, three and four, and not guilty on count one. These convictions were affirmed by this Court on December 27, 2012. See State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12), 106 So.3d 1232.

. Cary Smoot testified that he was aware of an ongoing territorial dispute between his cousin, Louis Smoot, and defendant and Roger Chairs regarding an area in River Ridge known as The Dump, a haven for drug-related criminal activity.

. Smoot’s vehicle was subsequently located at 616 Webster Street, several blocks away from the shooting incident. The vehicle had sustained three gunshots.

. It is noted that at the time of McKenzie’s testimony, he was incarcerated on various charges. McKenzie also testified that in ex-chanSe for testimony in this case, he was promised leniency.

. A photograph of Cary Smoot's phone indicating a call was made to defendant at 4:20 a.m. on November 8, 2009 was introduced into evidence.

. It is noted that at the time of Pollard’s and Bardell’s testimony, they were incarcerated on various charges.

. The audio recording and transcript of defendant’s statement was introduced into evidence.

. Powell Miller, Richard Brush’s defense counsel, testified that as of the time of trial, *1134 the State had not offered Brush any deal for his testimony in the case.