802 So.2d 779 (2001)
STATE of Louisiana
v.
Rodney A. TAYLOR.
No. 01-KA-452.
Court of Appeal of Louisiana, Fifth Circuit.
November 14, 2001.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, *780 Assistant District Attorneys, Gretna, LA, Attorneys for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, Gretna, LA, Attorney for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, CLARENCE E. McMANUS, and WALTER J. ROTHSCHILD.
SOL GOTHARD, Judge.
Defendant, Rodney Taylor, appeals his convictions in this case for a second time. For the following reasons, we affirm the defendant's sentences and convictions.
The defendant was charged by grand jury indictment with multiple crimes as follows: Count 1, aggravated rape, in violation of LSA-R.S. 14:42; Counts 2, 3 and 4, armed robbery, in violation of LSA-R.S. 14:64.[1] Defendant was tried by a twelve person jury on all four counts, and at the conclusion of trial, the jury returned verdicts of guilty as charged as to all counts. The trial count sentenced defendant as follows: Count 1, life imprisonment at hard labor without benefit of parole; Count 2, fifty years at hard labor without benefit of parole, to run concurrently with the sentence in Count 1; Count 3, fifty years at hard labor without benefit of parole, probation or suspension of sentence, to run consecutively with the sentence in Count 1; Count 4, fifty years at hard labor without benefit of parole, probation or suspension of sentence, to run concurrently with the sentence in Count 3 and consecutively with the sentence in Count 1.
In defendant's first appeal, appellate counsel filed an Anders[2] brief in this Court, asking only that the record be reviewed for errors patent. A panel of this Court reviewed the record, and after finding no issues to support an appeal, this Court affirmed defendant's convictions in an unpublished opinion. State v. Taylor, 96-300, (La.App. 5 Cir. 10/1/96), 681 So.2d 1324.
On November 19, 1998, defendant filed an application for post-conviction relief in the trial court, arguing ineffective assistance of trial counsel and appellate counsel. Defendant's application was denied by the trial court, and this court denied writs from that ruling. Defendant then filed an application for writ of review in the Louisiana Supreme Court. The court granted the writ in part, and ordered the district court to grant defendant an out-of-time appeal and to appoint counsel to pursue it. This appeal followed.

FACTS
At 8:00 p.m. on December 2, 1994, Norma Heintz was entering her apartment complex on Independence Street in Metairie, when she was approached by an African-American man holding a gun. The man did not say anything, but pointed the gun at her ribs. She told him to "take it," and he took her purse and fled on foot. Ms. Heintz testified that the purse contained between fifty and sixty dollars, as well as a payroll check from her employer, McKenzie's Pastry Shoppes. Ms. Heintz testified that the gunman was heavyset, and was about 6 feet, 2 inches tall. She later viewed two photographic lineups, but was unable to identify anyone as the man who robbed her.
At 9:00 p.m. on December 2, 1994, William Gilmore was outside a friend's apartment building on Carrollton Avenue in Metairie. *781 He planned to attend a Christmas party with those friends that evening, and he was carrying a gift-wrapped ice chest. Gilmore was entering the building's parking lot when he was approached by two men. One of them, his face partially covered with a handkerchief, pointed a gun at Gilmore's head. He ordered Gilmore to get on his knees and give them his wallet. Gilmore complied. When the men found no money in the wallet, they threatened to kill Gilmore. The men went through Gilmore's pockets, and, finding nothing, they took the wrapped ice chest and fled on foot.
Gilmore described the men as African American. One was tall and thin, and the other was tall and heavyset. The heavier man had on a baseball cap, and was growing a beard. The heavy man also had the gun. Gilmore viewed photographic lineups two weeks after the incident, but was not able to make an identification.
At 7:00 p.m. on December 3, 1994, L.C. and her fiancé, B.B., were watching television in their apartment on Carrollton Avenue in Metairie. The front door was left slightly ajar, as the couple was expecting guests. Two African American men entered the apartment through the door. The first man to enter (later identified as defendant) carried a gun. The men closed the door, drew the curtains, and disconnected the telephones. Defendant did most of the talking, angrily demanding to know where the money was. L.C. and B.B. told the men they did not have any money, and offered them their stereo equipment, their television, and B.B.'s shotgun. The men searched L.C.'s purse and found only three dollars.
Defendant asked L.C. if she was hiding money on her person, and demanded that she disrobe. She removed everything except her brassiere. Defendant ordered her to sit on the sofa. B.B. was ordered to lie on the kitchen floor, and the second man held the gun on him. Defendant pulled down the front of his pants, and demanded that L.C. perform oral sex on him. She complied. Defendant then knelt on the floor in front of the couch and had vaginal intercourse with her. L.C. testified that she repeatedly told defendant, "Please don't kill me." While defendant was having intercourse with L.C., the second man ordered her to perform oral sex on him. The second perpetrator continued to point the gun at B.B.. When defendant was finished, the second man passed the gun back to defendant and had vaginal intercourse with L.C. When the second man was finished, L.C. was ordered to lie on the floor next to B.B.
The perpetrators took B.B.'s shotgun and a cordless telephone and left the apartment. On his way out, defendant told the victims, "Thank you, have a good night." When they were certain the perpetrators were gone, B.B. called the police. L.C. was taken to Lakeside Hospital, where Dr. David Dunn performed a rape examination. Dunn collected hair and sperm samples. He found no evidence of physical trauma. However, he testified that L.C.'s demeanor, as well as her account of what had happened to her, were consistent with rape.
On December 7, 1994, the victims met with Detective Kelly Jones at a friend's home. Williams showed both of them two photographic lineups. After viewing the first lineup, both victims identified defendant as one of the perpetrators. L.C. testified that her identification was tentative, given that the man had worn a bandanna over the lower part of his face. When shown the second lineup, both victims identified Glen Styles as the other perpetrator. L.C. positively identified defendant in court as the first assailant, the one who had carried the gun. She identified *782 Styles in court as the second assailant. B.B. positively identified defendant in court as one of the perpetrators. B.B. testified that defendant has distinctive eyes, and he based his identification on their appearance.
Captain Merril Boling, an expert in the lifting and identification of fingerprints, testified that he lifted fingerprints from various surfaces at B.B.'s apartment. Fingerprints lifted from a glass coffee table in the apartment matched defendant's fingerprints.
Pamela Williams, forensic scientist and an expert in serology, tested samples of hair and bodily fluids collected from L.C., defendant, Styles and Bordes. She was unable to come to a conclusion as to the source of blood and seminal fluid found on the clothing L.C. wore on the night of the rape, as each of the parties had blood type O.
Detective Christy Williams of the New Orleans Police Department testified that she aided Jefferson Parish authorities in the investigation of this case by obtaining a search warrant for defendant's residence on Trafalgar Street in New Orleans. Among the items found in defendant's residence during the search were an ice chest, part of a portable telephone, a shotgun, and a paycheck stub. Ms. Heintz identified State's Exhibit 1 as the payroll check taken from her in the robbery. William Gilmore identified State's Exhibit 4 as the ice chest taken from him. B.B. identified State's Exhibit 29 as the shotgun taken from his apartment.
Defendant turned himself in to police on December 7, 1994, and was interviewed by Lieutenant Judith Erchul. During the course of the interview, defendant admitted to Erchul that he had robbed a Metairie woman of her payroll check, that he had been present during the robbery of a man in the Carrollton area, and that he had entered a couple's apartment, robbed them, and forced the woman to have oral and vaginal intercourse with him. He further admitted to having held a gun on the woman's fiancé while his fellow perpetrator raped the woman. Defendant stated that his partner in these crimes was a man named Glen, but that he did not know Glen's last name.
At trial, defendant took the stand and admitted to each of the crimes of with which he was charged. He denied that Glen Styles was involved in the crimes, stating that he committed the offenses with a man named Joseph Howard. He gave police Styles' name because he was afraid of retribution from Howard. Defendant testified that he was "high" on crack and alcohol when he committed the charged offenses, and that he was in search of money to buy more drugs.
Defendant testified that he put a gun to Norma Heintz's head and robbed her. He stated that he and his companion were both involved in the second armed robbery, although it was his friend who took Gilmore's wallet. Defendant further testified that he told L.C. to "make it hard," and removed his penis from his pants. She did not voluntarily have oral sex with him. He said he sexually assaulted L.C. due to "lust." While he was having sex with L.C., his companion said "is it any good? Let me hit it." His friend then took a turn sexually assaulting her while he held the gun on B.B. to keep him from interfering. Defendant further admitted to taking property from the apartment and hiding it at his house.

ANALYSIS
In his first allegation of error, the defendant contends that the evidence is insufficient to support the conviction for aggravated rape and armed robbery. He *783 argues that he successfully proved he was too intoxicated to form the intent necessary to complete the offenses. Defendant does not otherwise challenge the sufficiency of the state's evidence.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the essential elements of the crime in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Evans, 00-1766, p. 3 (La.App. 5 Cir. 4/11/01), 786 So.2d 781, 783; State v. Williams, 99-223, p. 6 (La App. 5 Cir. 6/30/99), 742 So.2d 604, 607.
Defendant repeatedly remarked during his trial testimony that he had purposefully used crack cocaine and marijuana and consumed alcohol before committing the instant offenses, and that he committed these crimes under the influence of drugs. Defendant's mother, Sandra Taylor, testified that when she saw defendant on December 3, 1994, he was acting strangely. She knew he was "on something." Rebecca Graham, defendant's grandmother, testified that she also saw defendant on December 3, 1994. She said he "acted different" that day, and seemed to be "on something."
LSA R.S. 14:15 provides:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
The statute dictates that voluntary intoxication can be a defense only in cases in which specific intent is a necessary element of the crime, where the defendant claims the intoxication precluded the capacity to form that intent. State v. Boleyn, 328 So.2d 95, 98 (La.1976); State v. Leroux, 94-133, p. 8 (La.App. 5 Cir. 7/26/94), 641 So.2d 656, 661. Aggravated rape is a general intent crime. State v. Kennedy, 00-1554, (La.4/3/01), 803 So.2d 916. Armed robbery is also a general intent crime. State v. Hebert, 29,062, p. 7 (La.App. 2 Cir.1/22/97), 688 So.2d 612, 617, writ denied, 97-0497 (La.9/5/97), 700 So.2d 503; State v. Sheppard, 94-694, p. 6 (La.App. 5 Cir. 11/16/94), 646 So.2d 1130, 1133, writ granted, reversed on other grounds, 95-0370 (La.9/13/96), 679 So.2d 899. Defendant was, therefore, not entitled to use voluntary intoxication as a defense, and his intoxication or lack thereof does not enter into a review of the sufficiency of the evidence at trial. We find no merit to defendant's allegation of error.
Defendant requests a review of the record in this case for errors patent pursuant to LSA C.Cr.P. art. 920. Defendant received an errors patent review upon his original appeal. Minor errors were found and addressed in this court's unpublished opinion. Defendant is not entitled to a second errors patent review. See, State v. Alberto, 95-540, p. 23 (La.App. 5 Cir. 11/28/95), 665 So.2d 614, 625, writs denied, *784 95-1677 (La.3/22/96), 669 So.2d 1222, 96-0041 (La.3/29/96), 670 So.2d 1237.
Accordingly, defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Glen Styles was charged as a co-defendant as to each count. The trial court granted Styles' motion to sever, and defendant was tried separately.
[2] Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).