FREDERICKA HOMBERG WICKER, Judge.
| ^Defendant, Edmundo Cerda-Anima, appeals his conviction for second degree murder. In his first assignment of error, defendant argues that there was insufficient evidence to support his conviction. In his second assignment, defendant argues that the trial court erred when it refused to give the jury his proposed instruction. For the following reasons, we find both of defendant’s assignments to be without merit and therefore affirm his conviction and sentence.

FACTS AND PROCEDURAL HISTORY

At approximately 8:45 p.m. on May 22, 2006, the victim, her son R.L., and two of her son’s friends, drove to Lafreniere Park to exercise.[1] Shortly before 9:00 p.m., *753 they arrived at the park. R.L. planned to jog with his Mends while his mother walked, and to call her on her cell phone when they finished. R.L. and his Mends stretched for about five minutes while the victim began walking. Soon after starting their jog, they passed up the victim, where R.L. patted his mother on |3the back, and told her they would see her soon. That was the last time R.L. saw his mother alive.
As a result of Hurricane Katrina, the park had several dark spots, where the lighting was out. At approximately 9:30 p.m., park ranger William Rowell, Jr. began his closing procedures whereby he checked and locked the restrooms, locked the West Napoleon gate, and then locked the walk-in gates. Lafreniere Park closed at 9:45 p.m. While going through these closing procedures, the ranger noticed a white SUV exiting the park by the Downs Boulevard gate. The driver’s side rear tire was blown out and the vehicle was travelling at approximately 15 to 20 miles per hour. The vehicle was not swerving. Ranger Rowell also noticed another vehicle in the park in which three men were seated. He stopped this vehicle, and discovered that its driver, R.L., was looking for his mother. Ranger Rowell assisted R.L. in looking for his mother and when they could not find her, he called 911. Outside of Lafreniere Park that night, several other witnesses observed the white SUV, a Ford Expedition.
Deputy Michael Nicolini, who at the time was an officer with the Jefferson Parish Sheriffs Office, was working a night shift that night from 9:80 p.m. until 5:30 a.m. Earlier that day, a New Orleans police officer had been shot, so Deputy Nicolini and some of his fellow officers decided to buy food and drink for officers keeping watch at the hospital. At approximately 9:45 p.m., Deputy Nicolini obtained provisions from the Brother’s Food Mart located just outside Lafreniere Park on Downs Boulevard. After Deputy Nicolini had made his purchases and as he was preparing to leave the store, his attention was drawn to a loud slapping noise from Downs Boulevard. Looking in that direction, the deputy determined the noise was coming from a white Ford Expedition exiting Lafreniere Park with rubber from its blown out tire slapping against its side. As the vehicle proceeded |4at about 10 miles per hour, Deputy Nicolini focused on the driver, whose window was down, for about 10 to 15 seconds. The vehicle then turned into the food mart’s parking lot.
Once in the well-illuminated parking lot, Deputy Nicolini continued to observe the driver of the vehicle. He looked at the driver’s face, who returned the officer’s gaze. Deputy Nicolini, who has specialized knowledge, training, and experience with DWI detection, observed nothing to indicate that the driver was intoxicated. Further, Deputy Nicolini did not observe the driver make any traffic violations. Based on his observation of the driver, the deputy determined that the driver was an able-bodied male who was perfectly capable of changing a flat tire. Assuming the driver had pulled into the lot to change the tire, Deputy Nicolini left the store and proceeded to the hospital. Deputy Nicoli-ni identified the driver of this vehicle as defendant both from a photographic lineup he was shown on May 24, 2006, and then again at trial.
Around 10:00 or 10:15 p.m. that night, Paul Sahuque, who resided at 6709 Made-wood Drive around the corner from the Downs Boulevard entrance to Lafreniere Park, was standing outside his residence smoking a cigarette when he heard a loud *754 noise that sounded like metal rubbing against the ground. As he looked in the direction of the noise, he observed a white Ford Expedition travelling at about 30 to 40 miles per hour down Wytchwood Drive. Mr. Sahuque noticed its rear rim on the driver’s side was rubbing the ground and sending off sparks. Despite the speed at which the vehicle was travelling, Mr. Sa-huque observed that the driver was nonetheless able to maintain control of the vehicle. It did not swerve nor strike any other vehicles in the road.
Johnny Rivers owns an auto detailing shop on David Drive which abuts Lafreni-ere Park. His shop is equipped with security cameras that record 24 hours a |sday. A video recording from 10:11 p.m. that night shows a white Ford Expedition, with a flat tire on its driver’s side rear, travel-ling down York Street towards David Drive.
Around that time, Shannon Alvarez, who lived at 8605 Dumonte Street not far from Lafreniere Park, had left work at 10:00 p.m. and was on her way home. At a red light on West Napoleon Avenue and David Drive, she witnessed a white Ford Expedition pass in front of her on David Drive heading south towards Airline Drive. Ms. Alvarez’s attention was drawn to the vehicle because the driver’s side rear tire was blown out and it was making a “clanking noise” on the pavement. Ms. Alvarez noticed that the vehicle had its hazard lights on and estimated that the vehicle was trav-elling 80 to 85 miles per hour. When the light turned green, Ms. Alvarez turned onto David Drive behind the vehicle. Travelling about a car length behind the vehicle, she observed that despite the blown out tire, the vehicle was being operated normally and it was not swerving. From David Drive, the vehicle turned right onto Lynnette Drive. As this was her route home, Ms. Alvarez made the same turn. From Lynette, Ms. Alvarez observed the vehicle turn right onto a dark and isolated canal embankment overgrown with grass. Ms. Alvarez stopped near this canal embankment to see if the driver needed to use her cell phone to get help to change the shredded tire. After a few seconds however, she left and proceeded home. At trial, Ms. Alvarez matched the vehicle she observed that night to defendant’s white Ford Expedition.
Early the next morning at the same canal embankment, the victim’s body was discovered. Her body was nude and in a prone position. The body had no noticeable signs of trauma except that blood and fluid were present around her mouth. Pebbles, gravel matter, and impressions or indentations were present on her back; and ants were on the victim’s face, mouth, anal and vaginal areas. The | ^impressions or indentations in the victim’s back led Captain Buras, who participated in the investigation at the scene, to believe that the body at one point was in a supine position. Several shoe and tire impressions were observed in the dirt and gravel near the victim’s body. Also found near the victim’s body were pants, underwear, and a right shoe. The pants had a grass stain on the back and were missing a button. At defendant’s trial, Captain Bu-ras testified that this scene indicated the victim’s death was not an accident.
The investigation at Lafreniere Park yielded various pieces of evidence including: a gray button; a left shoe; a shirt and a bra; and the victim’s cell phone and its battery. The left shoe matched the right shoe found near the canal in size and style. Later DNA tests on the shirt and bra revealed the presence of the victim’s genetic profile. The shirt and bra were entwined with one another and the bra straps were still clasped together. The cell phone was heavily damaged and at *755 tempts to retrieve data from the phone were unsuccessful.
Near where this evidence was recovered, investigating officers saw a tire mark on a curb next to a storm drain, pieces of tire rubber, and a tire impression in sand. Pieces of tire rubber were also found near the Downs Boulevard park entrance. From where this evidence was found inside the park to where the victim’s body was discovered was roughly a mile.
Dr. Karen Ross, an expert in the field of forensic pathology, performed the victim’s autopsy the next day. She concluded that the victim sustained multiple rib fractures on the left side of her body, a spleen laceration, and a bruised upper lobe of her left lung. The victim’s pelvis was fractured and her left hip was dislocated. Her face, trunk, and legs sustained abrasions. The back and left side of the victim’s head exhibited signs of hemorrhage. The victim’s neck was fractured and dislocated, and her brain also displayed signs of hemorrhage. Further, the victim |7sustained bruising on her forehead, face, upper arms, trunk and legs. At trial, Dr. Ross testified that these injuries were consistent with the victim being struck from behind by a vehicle travelling at least 15 miles per hour that did not attempt to brake.
As a result of the victim’s head and neck injuries, Dr. Ross opined that had the victim survived, she likely would have been a quadriplegic. Most importantly, Dr. Ross believed that after the victim was struck by the vehicle, she could have been alive for “some number of minutes, possibly half an hour.”
Dr. Ross also observed abrasions inside the victim’s vagina, labia, and near her anus. Bruising was present around the anus and in the anal canal. The abrasions to the vagina had hemorrhaged, which, as the doctor explained, indicated that the victim was alive at the time she sustained these injuries.
That next day, May 23, 2006, a deputy on patrol observed a vehicle parked in a rear alley in the 500 block of Eisenhower Avenue that fit Ms. Alvarez’s description of the vehicle she had seen near the canal embankment. Through investigation, detectives learned defendant owned this vehicle and that he resided in Apartment C at 501 Eisenhower Avenue. This information led detectives to interview Thomas Oliver, defendant’s roommate and employer.
Prior to Hurricane Katrina in August 2005, Mr. Oliver lived in Wichita, Kansas, where he had known defendant for a couple of years as his employee doing construction work. After Katrina, Mr. Oliver moved to Jefferson Parish to assist in the rebuilding effort. Defendant soon followed and resided with Mr. Oliver in Apartment C at 501 Eisenhower Avenue, about a mile from Lafreniere Park. On days defendant was not working, defendant typically gathered with co-workers at Lafreniere Park to consume beer.
|RAt trial, Mr. Oliver testified that he drove defendant’s Ford Expedition during the day of May 22, 2006. He testified that the Expedition was working properly and that he did not notice any damage to the front of the vehicle. When Mr. Oliver returned to their apartment between 6:00 and 7:00 p.m., he returned the vehicle’s keys to defendant. Mr. Oliver testified that sometime between 7:30 and 8:00 p.m. defendant left their apartment.
Mr. Oliver testified that defendant did not return home that night until around 11:00 or 11:30 p.m. At this time, Mr. Oliver observed defendant was dirty, with sand on his arms and legs. When Mr. Oliver asked defendant what happened, defendant, who was on the phone, ignored him. Although Mr. Oliver perceived de *756 fendant to be drunk, he didn’t think defendant was “that drunk” because defendant had driven home, parked his vehicle in the usual manner, climbed a metal spiral staircase that was not easy to navigate, and was carrying on a telephone conversation.
The next morning, defendant asked Mr. Oliver for money to fix a tire on his vehicle so he could go back to Wichita. Mr. Oliver was unable to give defendant the money, so he let defendant take his truck.
On May 24, 2006, after Mr. Oliver’s interview and after Deputy Nicolini’s identification, Detective Rodrigue obtained search warrants for defendant’s vehicle and apartment, as well as an arrest warrant for defendant. The search of the apartment turned up a pair of shoes in a garbage can, which Mr. Oliver subsequently identified as belonging to defendant.
Because defendant could not be located and was thought to be travelling in interstate commerce with the intent to avoid prosecution for a felony crime, a federal arrest warrant was issued on May 25, 2006. Defendant avoided capture on | flthis warrant for several years until May 14, 2010, when he was arrested in Juarez in the state of Chihuahua, Mexico.
On October 27, 2010, the FBI extradited defendant back into the United States. In Houston, Texas, Jefferson Parish Sheriffs Office took defendant into custody, advised him of his rights in Spanish, and transported him to the detective bureau in Jefferson Parish, Louisiana. There, and after defendant again waived his rights, defendant gave three taped statements through a translator.
In these statements, defendant admitted that he struck the victim with his Ford Expedition while driving in Lafreniere Park on the night of May 22, 2006. Defendant stated that he thereafter lifted the victim to put her in his vehicle, and at that point her shirt and bra fell off. Defendant stated that he began travelling to the hospital, but then turned in another direction because he feared he would get in trouble. Defendant then described the route he took from Lafreniere Park to the canal embankment. Thinking she was passed out, defendant put the victim on the ground and removed her pants to wake her up. Defendant stated that he was drunk and high on cocaine, and admitted that he touched, and penetrated, the victim’s vagina and anus with his hand and fingers. Defendant stated that he did not penetrate the victim with his penis because he was too intoxicated to achieve an erection. Defendant stated that he then realized what he was doing was wrong and went back to his apartment, leaving the victim’s body by the embankment. The next morning, defendant noticed a police officer examining his vehicle, became scared, and fled. After driving to Texas, defendant took a bus to Juarez, Mexico where he resided with his wife and children.
At trial, Colonel Timothy Scanlan, an expert in the field of crime scene investigation and reconstruction with the Jefferson Parish Sheriffs Office, testified that the damage sustained to the front right quarter panel of defendant’s vehicle | inwas consistent with the vehicle striking a pedestrian and flipping that person up onto the hood. Measurements of defendant’s vehicle were compared to the measurements of injuries on the victim’s body. This comparison revealed that the placement of the injuries on the victim’s body was consistent with defendant’s vehicle striking the victim. This comparison also indicated that the vehicle did not brake prior to striking the victim, which Colonel Scanlan stated was not consistent with accidental impact. Colonel Scanlan concluded that the totality of the evidence indicated a homicide had occurred.
*757 The defense called Wayne Winkler, an expert in the field of accident reconstruction, who testified that the victim was struck from behind on her left side by the right side of defendant’s vehicle. He estimated the vehicle was travelling between 15 and 25 miles per hour when it struck the victim. He stated that the collision could have caused the victim’s clothing to become rolled up and caused the victim’s pants’ button to dislodge from her pants. Mr. Winkler testified that he believed the evidence did not suggest that the victim was intentionally struck by defendant’s vehicle.
The defense also called Dr. Gerald Liuz-za, an expert in the field of forensic pathology, who reviewed the autopsy report of the victim. Dr. Liuzza believed the vehicle struck the victim from behind on the left side of her body. Dr. Liuzza also stated that the bruises sustained to the victim’s arms could have been caused by someone lifting the victim up by her arms. Although he initially testified that the type of abrasions the victim sustained to her vagina could have occurred after death, he later conceded that it was also possible that the victim sustained these injuries before dying.
Although Dr. Liuzza agreed with Dr. Ross’s conclusion that the victim died as a result of multiple blunt force injuries, he disagreed with her finding that the | ^manner of death was a homicide; he stated that he would have classified the manner of death as an accidental motor vehicle related fatality. Dr. Liuzza also disagreed with Dr. Ross’s opinion about how long the victim could have survived after the collision. He testified that the victim had a heartbeat for a very short period of time, no more than five minutes, after the victim was impacted by the vehicle.

DISCUSSION

First Assignment

Defendant first argues that the jury erred in finding him guilty of second degree murder in violation of La. R.S. 14:30.1 because the evidence presented against him was insufficient. Defendant argues that the evidence against him did not prove that he had a specific intent to kill or cause great bodily harm to the victim. Rather, defendant claims that the evidence shows that the victim was killed by an accident caused by an intoxicated and inattentive driver.
In reviewing sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, 534, writ denied, 10-1357 (La.1/7/11), 52 So.3d 885. Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required 112to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id.
The requirement that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to “ ‘the actual trier of fact’s rational credibility calls, evidence weighing and in *758 ference drawing.’ ” State v. Caffrey, 08-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10), 27 So.3d 297 (quoting State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, 56). “The reviewing court is not permitted ‘to decide whether it believes the witness or whether the conviction is contrary to the weight of the evidence.’ ” Id. It is not the appellate court’s function to re-evaluate the credibility of witnesses or re-weigh the evidence. Id.
La. R.S. 14:30.1 defines second degree murder as the killing of a human being when the offender, (1) has specific intent to kill or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies even though he has no intent to kill or to inflict great bodily harm. State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90 (citing La. R.S. 14:30.1), writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277. Although defendant argues that there was insufficient evidence to convict him of second degree murder because it did not prove that he had the required specific intent, he makes no argument regarding whether the evidence was sufficient to convict him under a felony murder theory for killing the victim while engaged in a felony enumerated in La. R.S. 14:30.1. Here, the jury was instructed as to both the specific intent and felony murder elements of second degree murder.
At the trial of this case, the jury heard witnesses testify for the State and for defendant, the evidence which we have set forth. We find that this evidence against defendant is sufficient to support his conviction for second degree murder | isbased on the elements of felony murder because defendant killed the victim while engaged in the enumerated felony of second degree kidnapping. Therefore, defendant’s assignment is without merit.
Felony second degree murder is defined by La. R.S. 14:30.1(A)(2) as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including second degree kidnapping. La. R.S. 14:44.1 defines second degree kidnapping in pertinent part as the forcible seizing and carrying of any person from one place to another wherein the victim is physically injured or sexually abused. La. R.S. 14:44.1(A)(3), (B)(1). In presenting its theory of felony murder, the State alleged that defendant was engaged in the commission or attempted commission of second degree kidnapping. One need not possess specific intent to kill or inflict great bodily harm to commit second degree felony murder. State v. Gurganus, 03-992 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, 775. Rather, under the felony murder theory, the State need only prove the commission of the underlying felony or the attempt thereof. Lewis, supra at 590.
The Court of Criminal Appeals of Texas faced a factually similar scenario to this case in Santellan v. State, 939 S.W.2d 155, 159 (Tex.Crim.App.1997). In Santellan, the defendant was convicted of capital murder in violation of Tex. Penal Code Ann. § 19.03(a)(2) for killing the victim while in the course of attempting to commit kidnapping. On appeal, the defendant argued that the evidence was insufficient to prove the elements of attempted kidnapping. Id. at 160. The defendant argued that he did not attempt a kidnapping of the victim because the victim died before he attempted to move her. The evidence adduced at trial indicated that the defendant had shot the victim four times, placed her unresponsive body in his vehicle’s passenger seat, transported her to a motel room, [uand there sexually abused *759 her. Id. at 160-62. The court in Santel-lan recognized that a dead body cannot be kidnapped. Id. at 162. However, the court found that the evidence did not unequivocally establish when the victim died and that there was sufficient evidence from which a jury could have reasonably concluded that the victim was still alive when the defendant lifted her into his car and drove away.[2] Id. at 163. Thus, the court held that the evidence and the defendant’s actions were sufficient to support a finding of attempted kidnapping. Id.
In this case, the evidence indicates defendant injured and incapacitated the victim by striking her with his vehicle. At trial, both Dr. Ross and Dr. Liuzza testified that the victim probably survived this impact for at least some time. After striking the victim at Lafreniere Park, defendant lifted her into his Ford Expedition, transported her to the canal embankment, and there sexually abused her. At trial, Dr. Ross specifically testified that the victim could have survived for up to a half hour after she had been struck by defendant’s vehicle and that the victim’s wounds indicated that she was still alive when she was sexually abused.
Viewing this evidence in the light most favorable to the prosecution, we find that the evidence here was sufficient to convince a rational trier of fact that all of the elements of second degree kidnapping and felony second degree murder were proven beyond a reasonable doubt.
Further, to the extent that defendant argues that his intoxication excused his killing of the victim, we also reject that defense. The State is not required to show defendant had specific intent to kill or cause great bodily harm to the victim in order to prove second degree murder under the theory felony murder. State v. Davies, 35,783 (La.App. 2 Cir. 4/5/02), 813 So.2d 1262, 1267, writ denied, 02 156415 (La.5/9/03), 843 So.2d 389. Additionally, voluntary intoxication, such as defendant’s, is only a defense for specific intent crimes. La. R.S. 14:15(2); State v. Taylor, 01-452 (La.App. 5 Cir. 11/14/01), 802 So.2d 779, writ denied, 01-3326 (La.1/10/03), 834 So.2d 426. Second degree kidnapping however, is a general intent crime. La. R.S. 14:44.1; See State v. Lagrange, 97-361 (La.App. 3 Cir. 10/29/97), 702 So.2d 1005, 1010.
Because we find the evidence was sufficient to convict defendant of second degree murder due to his killing of the victim while engaged in a second degree kidnapping, and because defendant’s voluntary intoxication is not a defense, we find defendant’s first assignment of error to be without merit.

Second Assignment

Defendant next argues the trial court erred when it failed to provide the jury with his proposed instruction of Vehicular Homicide to defendant’s charge of second degree murder. His proposed charge read,
Vehicular Homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the of the following conditions exists and such condition was a contributing factor to the killing: (4) the offender is under the influence of alcoholic beverages. Vehicular Homi *760 cide is not a responsive verdict to Second Degree Murder.
Therefore, if you find that the defendant committed Vehicular Homicide of [the victim], you must find the defendant not guilty.
While the trial court did not read this charge to the jury, the record shows that defendant was permitted to argue this law in his closing statement.
Our law mandates that the court shall charge the jury “as to the law applicable to the case.” La.C.Cr.P. art. 802(1). The State and the defendant shall have the right to submit special jury charges and the court shall give a requested |1fispecial jury charge, “if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” La.C.Cr.P. art. 807. The court is required to charge the jury on the law applicable to any theory of defense, when properly requested, which the jurors could reasonably infer from the evidence. State v. Netter, 11-202 (La.App. 5 Cir. 11/29/11), 79 So.3d 478, 482, writ denied, 12-0032 (La.8/22/12), 97 So.3d 357 (citing State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 527). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Henry, 08-658 (La.App. 5 Cir. 10/27/09), 27 So.3d 935, 946, writ denied, 09-2485 (La.4/23/10), 34 So.3d 269; Lawson, supra.
“When a count of the indictment sets forth an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense.” La. C.Cr.P. art. 803. A list of enumerated responsive verdicts is set forth in La. C.Cr.P. art. 814, which provides, in pertinent part as follows:
A. The only responsive verdicts that may be rendered when the indictment charges the following offenses are:
[[Image here]]
3. Second Degree Murder:
Guilty.
Guilty of manslaughter.
Guilty of negligent homicide.
Not guilty.
[ ,7rfhe Louisiana Supreme Court has consistently held that when, as here, responsive verdicts are mandated by La. C.Cr.P. art. 814, the trial court is without authority to add to the prescribed verdicts. State v. Farhood, 02-490 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 223 (citing State v. Square, 433 So.2d 104, 109 (La.1983)). Because we find that defendant’s proposed jury charge regarding vehicular homicide is not a responsive verdict to his charge of second degree murder, we hold that the trial court did not err in failing to add defendant’s proposed instruction to the list of responsive verdicts to defendant’s second degree murder charge.
Further, we find that here, where the defense argued its theory of vehicular homicide in both its opening and closing statements, and where a finding that defendant committed all the elements of vehicular homicide would not necessarily preclude a finding that defendant committed all of the elements of second degree murder, defendant was not prejudiced nor denied his rights by the trial court’s refusal to give his proposed instruction as a defense. Therefore, we find this assignment of error to also be without merit.

*761
ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 387 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review revealed no errors patent in this case.

DECREE

Because we find both of defendant’s assignments of error to be without merit, and because our review has revealed no errors patent, we hereby affirm defendant’s conviction and sentence.

AFFIRMED

. The identity of R.L. is withheld in this opinion pursuant to La. R.S. 46:1844. That statute protects the identity of crime victims who *753 are minors or victims of sex offenses. La. R.S. 46:1844(W).

. Evidence admitted at the Santellan trial showed that after the victim had been shot her heart could have still been beating for three to five more minutes, enough time for that defendant to lift the victim into his vehicle. Santellan, 939 S.W.2d at 162.