ROBERT M. MURPHY, Judge.
| ^Defendant, Darnell Turner, was convicted of the second degree murder of Donald Bates in violation of La. R.S. 14:30.1. After the denial of his motion for new trial, the trial court sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant’s timely appeal followed. For the reasons that follow, we affirm Defendant’s conviction and sentence and remand the matter to the trial court for correction of an error patent as noted herein.
FACTS AND PROCEDURAL HISTORY
On January 28, 2010, Donald Bates cashed a $12,000.00 check at Ace Check Cashing that he received for the sale of his vehicle. Rhonda Skinner was with Bates at the time he cashed the check. Before bringing Skinner to her home, Bates purchased marijuana and crack and gave her money to purchase a phone. Bates also offered Skinner money in exchange for sexual relations, which she refused but ultimately agreed to think about it. That night, Mr. Bates was counting the money with his wife, Caroline Bates, at their home at 2217 Eastmere Street, which is located in the Woodmere neighborhood. He told his wife that he wanted to use the money to pay traffic tickets, insure their truck, and obtain groceries. He placed *742 $2,000.00 in an envelope for past-due rent, which was left on the kitchen | stable before Mrs. Bates left for work the next morning. Bates also gave his wife an additional $2,000.00 for the next two months’ rent, which she hid in a guestroom within their residence.
On the following morning of January 29, 2010, Mrs. Bates left their residence at approximately 6:00 a.m. to go to work. Bates was still in bed sleeping when she left. When she returned home from work that day at approximately 3:00 p.m., she noticed that her husband’s van was not at their home. When she attempted to unlock the door to her residence, she noticed that the door was unlocked. Knowing her husband usually did not leave the door unlocked, she called a friend to come over to her house. She and a friend opened the glass door and noticed spots of blood on the floor, at which point they chose not to go inside and called the police.
Deputy Jeffrey Easterby of the Jefferson Parish Sheriffs Office responded to Mrs. Bates’ call at her residence. Once inside, Deputy Easterby noticed that the home had been ransacked, with the furniture disturbed, drawers pulled out with property removed, and mattresses flipped up. He discovered the victim, Bates, who did not appear to be alive, on the bathroom floor of the master bedroom. The victim was dead and had sustained multiple different types of traumatic injuries, including four gunshot wounds, blunt force trauma wounds, and superficial incised wounds.
Detective Gary Barteet of the Jefferson Parish Sheriffs Office testified regarding the scene and the evidence seized from the residence. Based on the presence of blood in multiple areas of the residence, the scene indicated that there had been a struggle in the foyer/hallway area, just past the front door, and that portions of the residence had been searched and left in disarray. The mattress had been pulled off of the bed, and a baseball bat was found on the box springs. |4Petective Bar-teet believed that there were at least two people involved due to the violence, which seemed to indicate that the victim was “striking back.” He did not find any evidence that indicated there was forced entry. The police recovered four 9 mm fired cartridge cases, two of which were discovered in the hallway and the remaining two were discovered in the bathroom. A pillow was also found in the bathroom on the victim that had been penetrated by a passing bullet.
Once Mrs. Bates was allowed to return to her home, she noticed that a World War II plaque from her father was missing, as well as the $2,000 which had been left inside an envelope on the kitchen table. She also found a blood-covered knife inside a drawer of her home.
Dr. Susan Garcia, an expert in the field of forensic pathology, performed the autopsy on the victim and determined that one of the gunshots punctured his heart and went through his right lung, which she believed was a lethal wound. The victim had other gunshot wounds, including one to his leg. Dr. Garcia believed that the incised wounds to the victim’s scalp, neck, and fingers were caused by a sharp object, possibly a knife. She further believed that the blunt force trauma to the victim’s head was consistent with him being struck by a hard object, possibly a baseball bat.
Detective Solomon Burke of the Jefferson Parish Sheriffs Office testified that the victim’s van was recovered on the night of the murder on a dead-end road near the intersection of Jordan Street and Ray Street, within the Haydel area. Someone had made an attempt to set the van on fire, but the fire was unsuccessful due to the fact that it was set inside of a *743 sealed van. A baseball cap was found on the ground a few feet away from the driver’s side door of the van. Detective Burke testified that he obtained an exigent circumstance request for the victim’s cell phone. It was discovered that the last phone call received by the victim was from | ¡¡Rhonda Skinner. The phone traced Skinner’s phone to a hotel, where she was found. The police recovered Skinner’s phone, but the SIM card had been removed. Skinner was brought to the Detective Bureau as a person of interest where she gave seven taped statements over the course of approximately twenty-four hours, all of which were played for the jury at trial.
In Skinner’s first statement, taken at 2:15 a.m. on January 31, 2010, she admitted that she knew the victim, and that she was with him on January 28, 2010 when he cashed his $12,000.00 check at Ace Check Cashing. She further admitted that she called him from her home in the Bee-chgrove area at approximately 8:00 a.m. on January 29, 2010 to discuss his previous offer of money in exchange for sex.
In her third statement at 2:11 p.m., Skinner admitted that her call to the victim on the morning of January 29, 2010 took place while she was in the same area where the victim’s residence is located— the Woodmere area. She stated that she was in the Woodmere area to inspect an apartment for rent. While walking, a car stopped beside her with two males inside. She described the driver, and said that a man she knew as “Nasty” was in the passenger seat. She stated that Nasty advised her that he was about to “hit a lick,” (meaning “to steal”), and that he was going to “get it” from the victim, whom he referred to as “Mr. Don.” In her fourth statement, taken at 3:55 p.m., Skinner added that Nasty already knew that the victim had recently received a large sum of money for the sale of his ear, and that he intended to knock on the victim’s door and impersonate a lawn service worker. Once the victim opened the door, she stated that Nasty told her that he planned to force his way in.
In her fifth statement, given at 6:15 p.m., Skinner admitted that she had withheld some information from her prior statements. Specifically, she admitted | ¡¡that she had received a phone call from Nasty on the morning of January 29, 2010, wherein he asked her to meet him in the Woodmere area. She said that she called Mr. Don when she got to the Woodmere area, at around 8:00 a.m. She then said that Nasty called her a second time, and came to meet her in a vehicle. He was on the passenger’s side and she said that the driver was someone she had never seen before. At Nasty’s request, Skinner called the victim again at 8:53 a.m. to see if he was at his home. After her conversation with the victim, she again confirmed that Nasty told her he was going to “get a lick off of Mr. Don,” which she understood to mean that he was going to take the money the victim had received the previous day, and that Nasty planned to get inside the house by pretending to be a lawn service worker. Skinner admitted that she confirmed to Nasty that the victim had the money, but she denied any involvement in the victim’s murder. Although she did not know Nasty’s real name, she did have information about his mother and his sister, from which the police were able to identify Nasty’s real name as Terrol Cole. Thereafter, Skinner identified Terrol Cole as Nasty in a photographic lineup.
In another statement, which was given on January 31, 2010, at 9:33 p.m., Skinner admitted that she had held back information because she was scared of those involved and of going to jail. She stated that after she agreed to meet Cole in the *744 Woodmere area on the morning of January 29, 2010, she met him at a house located within that area on Destrehan Avenue. She then went for a ride with Cole in a car driven by a female later identified as Ka-trice Batiste, and a man she knew as “Darnell.” During the car ride, Cole told her about his plan to rob the victim. She said they passed Mr. Don’s house on Eastmere Street, and that she saw Mr. Don’s van at his home. Skinner further stated that the driver was told to stop at a stop sign near Eastmere Street, at which point Cole and “Darnell” exited the car. She eventually saw the two men walk back towards the victim’s house. She then 17returned to the house on Destrehan Avenue. Shortly thereafter, Skinner stated that she left the Destrehan Avenue house with Batiste and one other female later identified as Tanis-hia Stamps, and went to another house located on Marine Street in the Haydel area.
Once Skinner arrived at the Marine Street house, she stated that she observed Cole in the back of the residence, changing his clothes and sweating. She said that Cole told her that the victim opened the door, but stated that he only admitted to having $2,800.00. Cole told her that the victim and “Darnell” were struggling over the gun, and that he had to help Darnell by hitting the victim. She stated that “Darnell” told her that he shot the victim in the foot and that he “poked” him with a knife because he wouldn’t cooperate. She said that Cole told her that they took the victim’s van, which they intended to burn. Skinner’s final statement was made in reference to a photographic lineup, in which she identified Defendant, Darnell Turner, as the other person involved in the murder named “Darnell.”
Detective Burke testified that Skinner was arrested after her statements, which led to arrest warrants for Defendant and Cole. The investigation revealed that Defendant’s residence was located at 3000 Destrehan Avenue and his father’s residence was located at 1624 Marine Street. At trial, Skinner testified that she had entered into a plea agreement, wherein her second degree murder charge was reduced to conspiracy to commit armed robbery in exchange for her testimony in this case.
As previously provided in her recorded statements, she admitted that on January 29, 2010, she went to the Woodmere area with Katrice Batiste, Tanishia Stamps, Defendant, and Cole. She admitted that she and Cole had a conversation wherein she confirmed to him that the victim did have the money. While in the car, she testified that Cole talked to her about “hitting a lick” on the victim, and that |sDefendant was in the car at the time of this conversation. Skinner further testified that at some point Cole agreed to give her a $2000.00 cut from the victim’s money.
She testified that after Cole instructed Batiste to stop the vehicle at a stop sign near the victim’s house, Cole and Defendant exited the vehicle. Skinner and Batiste drove off and eventually returned to the house on Destrehan Avenue. After receiving a call from Cole, Skinner went to the house on Marine Street with Batiste and Tanishia Stamps. Skinner testified that she went to look for Cole and found him and Defendant in a room in the back of the house. Skinner testified that Cole told her that he “popped Mr. Bates cause he was struggling with Darnell” over a gun. She said she witnessed Cole put a plastic bag into the trunk of the car before they left the Marine Street house in Batiste’s vehicle. Skinner testified that she identified Defendant in a photographic lineup at the Detective Bureau, and she also identified Defendant in court.
*745 Detective Burke testified that he interviewed Batiste and Stamps, both of whom corroborated what was learned from Skinner. At trial, Batiste testified that at the time of the incident, she had known Cole and Defendant for about a month. On the night before the victim’s murder, Batiste testified that she and Stamps spent the night at the Marine Street house with Cole and Defendant. When they woke up on January 29, 2010, they picked up Skinner and went to Defendant’s house at 3000 Destrehan. Later that morning, Batiste, Skinner, Defendant, and Cole left Defendant’s house in her car, and she and Skinner dropped off Defendant and Cole on Post Street in the Woodmere area.
Batiste testified that she, Skinner, and Stamps went to the Marine Street house to meet Cole and Defendant later that same day. She noticed that both Defendant and Cole had changed their clothes. When Batiste sat on the sofa, she testified that she almost burned her arm on a pistol, which was hot to the touch.
|sA few days later, Batiste and Stamps picked up Defendant and drove to Baton Rouge to meet up with Cole. Defendant stayed in Baton Rouge with Cole, but Ka-trice and Tanishia went home. Batiste and Stamps eventually drove Cole and Defendant to Little Rock, Arkansas, and stayed there for a few days. She explained that Stamps reserved the hotel rooms because Defendant and Cole did not want to use their identifications. While in Little Rock, Batiste asked Cole about the “hot gun” that she found on the sofa at the Marine Street house. He told her that it was hot because he put a pillow over the victim’s face and “hit it” five times.
Batiste and Stamps were arrested in Batesfield, Mississippi on their way home. Batiste gave the police information regarding Defendant and Cole, which Detective Burke explained included specific details that matched the crime scene and had not been provided to anyone. As a result, Defendant and Cole were later captured in Arkansas with the assistance of the U.S. Marshals Fugitive Recovery Task Force.
Adriana Perez testified as an expert in the field of forensic DNA analysis and prepared a report regarding the items she tested that were recovered during the homicide investigation. She testified that she obtained a mixed DNA sample from the baseball cap recovered near the victim’s van, which could be explained by multiple people wearing the cap. She determined that approximately 99.9% of the entire population could be excluded as a possible donor of the DNA found on the baseball cap, but that Defendant could not be excluded as a donor.
Susan Johnson, custodian of records for T-Mobile, testified regarding subscriber information, call detail records, and cell site information. She also testified regarding a map with cell towers and their locations. Ms. Johnson 110testified that between January 29, 2010 and January 30, 2010, multiple calls were made between Defendant, Cole and Skinner.
Defendant testified at trial and admitted his prior convictions. He testified that his mother owned the house located at 3000 Destrehan Avenue, which was where he was living at the time of the incident, and that his father rented the house located at 1624 Marine Street. Defendant testified that on January 28, 2010, he, Cole, Batiste and Stamps spent the night at his father’s house at Marine Street. Defendant testified that on January 29, 2010, they left the Marine Street house after 8:00 a.m., went to pick up Skinner in Batiste’s car, and then went to his house at 3000 Destrehan Avenue. After about thirty minutes, he testified that Cole, Batiste, Stamps and Skinner left his house on Destrehan Street, while Defendant remained there *746 until 4:45 p.m. He testified that he did not hear from them again until approximately 6:00 p.m., at which time Defendant was at his father’s house on Marine Street. Defendant then took his father’s vehicle and picked up Cole at Cole’s mother’s house. Defendant and Cole spent the night at the Marine Street house with Tanishia and Katrice, who later joined them.
Defendant denied ownership of the baseball cap found near the victim’s van, but admitted that it was shown that his DNA was on the hat. He testified that he could have come into contact with the cap, but he claimed he was not the only person who used his clothing. Defendant denied ever seeing the victim or being inside the victim’s residence. He denied any knowledge that Cole was planning to rob Bates, or that he and Cole were dropped off at an intersection near the victim’s house on the day of the incident.
On cross-examination, Defendant was confronted with evidence that his cell phone records showed that he was in the Haydel area at around noon on January 29, 2010, which was the same time that he claimed to be at his Destrehan home, |,,which is located in the Woodmere area. Defendant testified that he could have dropped his phone in Batiste’s car earlier that day, and that he in fact got his phone back when Batiste and Stamps returned to the Marine Street house later that day.
LAW AND DISCUSSION
In his sole assignment of error, Defendant contends that the evidence presented at trial was insufficient to convict him of second-degree murder. He raises this argument on two grounds: (1) that the State failed to prove beyond a reasonable doubt that he was the person who killed the victim; and (2) that the State failed to prove beyond a reasonable doubt that the victim was killed while Defendant was engaged in a felony or attempting to engage in a felony enumerated in La. R.S. 14:S0.1(A)(2). Additionally, Defendant contends. that Skinner’s trial testimony consisted of double-hearsay testimony, and that it only showed that Cole shot the victim and discussed setting up the robbery of the victim — not that Defendant acted as a principal to the offense of second degree murder. Defendant further contends that the State failed to negate a reasonable probability of misidentification.
The State first responds that the evidence, viewed in the light most favorable to the State, was sufficient to convince a rational trier of fact that Defendant was guilty of second degree murder. Specifically, the State contends that the evidence showed that Defendant, who fled Louisiana, could not be excluded as a donor of DNA found inside of the baseball cap found at the scene of the victim’s partially burned van. The State also contends that Skinner’s testimony did not constitute hearsay, but nevertheless, that claim is not properly before this Court because hearsay evidence not objected to constitutes substantive evidence.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct; 2352, 141 L.Ed.2d 722 (1998). A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found the State proved the essential elements of the crime beyond a reasonable doubt. State v. Price, 00-1883 (La.App. 5 Cir. 7/30/01), 792 So.2d *747 180, 184. Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
“The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. On appeal, the reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant could afford an exculpatory explanation of the events. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83 (quotation omitted). Rather, the reviewing court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.
“All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” La. R.S. 14:24. Mere presence at the scene of the crime does not make one a principal to the crime. State v. Massey, 11-357 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 463, writ denied, 12-0991 (La.9/21/12), 98 So.3d 332 (quotation omitted). Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. Id. Whether a defendant actually fires the bullet that kills a victim is of no consequence, and the defendant may be convicted as a principal to the crime. Id. at 463-64. However, a principal may be connected to only those crimes for which he has the requisite mental state. Id. at 464.
Here, Defendant was convicted of second degree murder. Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including but not limited to aggravated burglary, armed robbery, first degree robbery, second degree robbery and simple robbery, even though he has no intent to kill or to inflict great bodily harm. See State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277. In this case, the jury was instructed as to the felony murder theory of second degree murder under La. R.S. 14:30.1(A)(2); specifically, that Defendant was engaged in the perpetration or attempted perpetration of an armed robbery, first degree robbery, simple robbery, or aggravated burglary at the time of the incident. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. State v. Cerda-Anima, 12-682 (La.App. 5 Cir. 5/30/13), 119 So.3d 751, 758, writ denied, 13-1487 (La.1/10/14), 130 So.3d 321. Rather, under the felony murder doctrine, the State need only prove the commission of the underlying felony or the attempt thereof. Id.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant’s identity as the perpetrator. State v. \uPage, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 447, writ denied, 09-2684 (La.6/4/10), 38 So.3d 299. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry *748 its burden of proof. Id. Positive identification by one witness is sufficient to support a conviction. State v. Harris, 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.
At trial, the jury heard witnesses testify for the State and for Defendant, as we have set forth above. We find that the evidence against Defendant is sufficient to support his conviction for felony second degree murder. The State presented evidence that the victim was killed during the perpetration of an armed robbery or an aggravated burglary. Specifically, the evidence established that the victim’s home was left in disarray, with several rooms ransacked and rummaged through, and that a gun, knife, and baseball bat were used in the perpetration of a robbery or burglary. Testimony was presented indicating that two perpetrators entered the victim’s house while they struggled with him and searched his home. There were no signs of forced entry, which corroborated Skinner’s testimony that that Cole intended to enter the victim’s home under a lawn service ruse. Skinner testified that Defendant was in the car during this conversation. Mrs. Bates testified that several items, including money, were missing from her residence after the murder.
Furthermore, we find that the evidence was sufficient to identify Defendant as a principal to the crime. The jury heard evidence regarding phone calls between Defendant, Skinner, and Cole on the day of the murder. Testimony from Skinner and Batiste established that Defendant was with Cole prior to the murder, that he was dropped off with Cole near the victim’s residence on the day of the murder, and that he and Cole had changed their clothing later that day. Skinner testified that Cole told her that the victim was shot because he was struggling with | lsDefendant over a gun. Skinner also provided in a statement that Defendant admitted to striking the victim with a knife. One of the statements also suggested that Defendant had possibly shot the victim. Phone records placed Defendant at a location after the murder that was contrary to his testimony, although he testified that he had dropped his phone in Batiste’s car. Additionally, the DNA testing showed that Defendant could not be excluded as a donor of DNA inside of the baseball cap found several feet away from the victim’s partially burned van.
Although Defendant took the stand at trial and denied that he was dropped off with Cole near the victim’s home on the date of the murder, or that he had any involvement in the crime, the jury chose to give more credibility to the evidence establishing Defendant’s involvement. The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. Because it is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law, we find no abuse of discretion in the jury’s credibility findings.
We also find no merit to Defendant’s argument regarding the alleged double hearsay nature of Skinner’s testimony. First, our review of the record establishes that Defendant requested that Skinner’s taped statements be played for the jury, and waived any objections as to foundation or hearsay therein. Moreover, we find that Defendant made no objections to Skinner’s testimony at trial on the basis *749 of hearsay. In order to preserve the right to seek appellate review of an alleged trial court error, the party alleging the error must state an objection contemporaneously | lfiwith the occurrence of the alleged error, as well as the grounds for that objection. State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, writ denied, 05-0081 (La.4/22/05), 899 So.2d 559. Because Defendant failed to contemporaneously object to Skinner’s testimony at trial as hearsay, this issue has not been preserved for appellate review.
After viewing the evidence in a light most favorable to the prosecution, we find that the State sufficiently negated any reasonable probability of misidentification, and a rational trier of fact could have found, beyond a reasonable doubt, that Defendant was guilty of felony second degree murder. Accordingly, we find Defendant’s assignment of error to be without merit.

Error Patent Discussion

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals an error in the “State of Louisiana Uniform Commitment Order.” The Uniform Commitment Order reflects the incorrect date, February 23, 2010, as the date of the offense. Accordingly, to ensure an accurate record, we remand this case and order the Uniform Commitment Order to be corrected to reflect the correct date of the offense, January 29, 2010. We further direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected Uniform Commitment Order to the officer in charge of the institution to which Defendant has been sentenced and to the Department of Corrections’ Legal Department. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142, citing La.C.Cr.P. art. 892(B)(2).
^CONCLUSION
Accordingly, for the foregoing reasons, we affirm Defendant’s conviction and sentence for one count of second degree murder, in violation of La. R.S. 14:30.1. The matter is remanded to the trial court for correction of an error patent as noted herein, and the Clerk of Court for the 24th Judicial District Court is ordered to transmit the original of the corrected Uniform Commitment Order to the officer in charge of the institution to which Defendant has been sentenced and to the Department of Corrections’ Legal Department.

CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT.